ACCEPTED
03-15-00025-CV
7017794
THIRD COURT OF APPEALS
AUSTIN, TEXAS
9/21/2015 2:41:41 PM
JEFFREY D. KYLE
CLERK

**No. 03-15-00025-CV**

## Texas Court of Appeals
## Third District
## Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
9/21/2015 2:41:41 PM
JEFFREY D. KYLE
Clerk

**APPELLANTS, LAKEWAY REGIONAL MEDICAL CENTER, LLC AND SURGICAL DEVELOPMENT PARTNERS, LLC// CROSS-APPELLANT, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC**

**v.**

**APPELLEES, LAKE TRAVIS TRANSITIONAL LTCH, LLC N/K/A LAKE TRAVIS SPECIALTY HOSPITAL, LLC// CROSS-APPELLEES, LAKEWAY REGIONAL MEDICAL CENTER, LLC, SURGICAL DEVELOPMENT PARTNERS, LLC, BRENNAN, MANNA, & DIAMOND, LLC AND FRANK T. SOSSI**

FROM THE 345TH JUDICIAL DISTRICT COURT, TRAVIS COUNTY, TEXAS
CAUSE NO. D-1-GN-12-000983

# LAKEWAY REGIONAL MEDICAL CENTER, LLC'S AND SURGICAL DEVELOPMENT PARTNERS, LLC'S OPENING APPELLANTS' BRIEF

NORTON ROSE FULBRIGHT US LLP
Jeff Cody
State Bar No. 04468960
jeff.cody@nortonrosefulbright.com
Barton W. Cox
State Bar No. 2406508
beau.cox@nortonrosefulbright.com
James V. Leito IV
State Bar No. 24054950
james.leito@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone:     (214) 855-8000
Telecopier:    (214) 855-8200

NORTON ROSE FULBRIGHT US LLP
Joy M. Soloway
State Bar No. 18838700
joy.soloway@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:     (713) 651-5151
Telecopier:    (713) 651-5246

WRIGHT & CLOSE, LLP
Jessica Z. Barger
State Bar No. 24032706
barger@wrightclose.com
Raffi O. Melkonian
State Bar No. 24090587
melkonian@wrightclose.com
One Riverway, Suite 2200
Houston, TX 77056
Telephone:     (713) 572-4321
Telecopier:    (713) 572-4320

*Counsel for Appellants/Cross Appellees*
***ORAL ARGUMENT REQUESTED***

**LIST OF PARTIES AND COUNSEL**

1.     Appellant/Cross Appellee is Lakeway Regional Medical Center, LLC.

2.     Appellant/Cross-Appellee is Surgical Development Partners, LLC.

3.     Trial counsel for Appellants/Cross-Appellees Lakeway Regional Medical Center, LLC, and Surgical Development Partners, LLC, were Jeff Cody, Barton W. (Beau) Cox, and James V. Leito IV, NORTON ROSE FULBRIGHT US LLP, 2200 Ross Avenue, Suite 3600, Dallas, TX  75201-7932.

4.     Appellate counsel for Appellant/Cross-Appellee Lakeway Regional Medical Center, LLC are Jeff Cody, Barton W. (Beau) Cox, and James V. Leito IV, NORTON ROSE FULBRIGHT US LLP, 2200 Ross Avenue, Suite 3600, Dallas, TX 75201-7932, and Joy M. Soloway, NORTON ROSE FULBRIGHT US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010-3095.

5.     Appellate counsel for Appellant/Cross-Appellee Surgical Development Partners, LLC are Jeff Cody, Barton W. (Beau) Cox, and James V. Leito IV, NORTON ROSE FULBRIGHT US LLP, 2200 Ross Avenue, Suite 3600, Dallas, TX  75201-7932, Joy M. Soloway, NORTON ROSE FULBRIGHT US LLP, 1301 McKinney, Suite 5100, Houston, TX 77010-3095, and Jessica Z. Barger and Raffi O. Melkonian, WRIGHT & CLOSE, LLP, One Riverway, Suite 2200, Houston, TX 77056.

6. Appellee/Cross-Appellant is Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC.

7. Trial counsel for Appellee/Cross-Appellant were S. Abraham Kuczaj III, Paige A. Amstutz and Steven J. Wingard, SCOTT, DOUGLASS & MCCONNICO, LLP, 303 Colorado, Suite 2400, Austin, TX 78701.

8. Appellate counsel for Appellee/Cross-Appellant are Jane Webre, S. Abraham Kuczaj III, Paige A. Amstutz, and Steven J. Wingard, SCOTT, DOUGLASS & MCCONNICO, LLP, 303 Colorado Street, Suite 2400, Austin, TX 78701.

9. Appellees are Brennan, Manna & Diamond, LLC and Frank T. Sossi.

10. Trial and appellate counsel for Appellees are Robert Bragalone and B. Ryan Fellman, GORDON & REES LLP, 2100 Ross Avenue, Suite 2800, Dallas, TX 75201.

**TABLE OF CONTENTS**

                                                                                    **Page**

LIST OF PARTIES AND COUNSEL.................................................................i

TABLE OF AUTHORITIES .......................................................................vi

STATEMENT OF THE CASE................................................................. xii

STATEMENT REGARDING ORAL ARGUMENT ...........................................xiv

ISSUES PRESENTED BY APPELLANTS............................................................xv

RECORD REFERENCES ....................................................................... xviii

STATEMENT OF FACTS ............................................................................1

    I.      Congressional action impacts two potential Texas hospitals...............1

           A.      Construction of Lake Travis Specialty Hospital began in 2008.....................................................................................1

           B.      Others began planning a hospital—Lakeway Regional Medical Center—in 2008.........................................................2

    II.     Berry, McDonald, and Lakeway Regional decide to explore the feasibility of Lake Travis Specialty Hospital becoming Lakeway Regional Medical Center's initial campus. .........................3

    III.    A Letter of Intent is signed, and Lakeway Regional considers whether to acquire the Lease from LTT................................................4

    IV.    Lakeway Regional decides against acquiring the Lease......................6

    V.    In March 2010, Lakeway Regional secures a HUD-insured loan for its own project; Sossi sends his "May 10 email" two months later.......................................................................................................7

    VI.    LTT completes construction of Lake Travis Specialty Hospital, but it does not open. ...................................................................8

    VII.   The lawsuit, summary judgment orders, trial, and judgment. .............9

           A.      LTT sues Lakeway Regional, SDP, and Attorney Defendants. .............................................................................9

B.    The trial court grants partial summary judgment for Lakeway Regional and SDP and complete summary judgment for the Attorney Defendants. ...................................10

C.    The case proceeds to trial; LTT prevails on its contract claim. ...................................................................11

D.    The post-verdict orders and judgment. ....................13

SUMMARY OF ARGUMENT ........................................................................14

STANDARDS OF REVIEW ..........................................................................17

ARGUMENT ................................................................................................19

I.    The Jury's Verdict Is Not Supported by Legally or Factually Sufficient Evidence. .........................................................19

A.    The evidence is insufficient to show that any alleged breach of the Letter of Intent *caused* the damages awarded to LTT.....................................................................19

B.    The jury's damage awards are not supported by legally or factually sufficient evidence. ...................................24

1.    There is no legally or factually sufficient evidence of damages sustained by Berry and McDonald (parties to the Letter of Intent); LTT presented evidence only of its own alleged damages. ...................25

2.    The jury's $7.9 million award cannot stand. .................28

a.    The jury's lost value award has zero support in the record......................................................29

b.    Berry's opinion was conclusory, speculative, and lacking in reasonable certainty. ...................31

c.    The range cases do not apply. .............................39

d.    Any finding that the jury's award of $7.9 million was foreseeable is not supported by legally or factually sufficient evidence. ..............40

e.    LTT has no valid argument to support the $7.9 million award...............................................44

3.    The jury's award of $790,000 is also unsupported by legally or factually sufficient evidence.....................47

II.    The Trial Court Committed Fatal Charge Error; a New Trial Is Warranted. ........................................................................49

    A.    Under *Casteel*, and the facts of this case, the trial court was required to list the specific provisions of the Letter of Intent that could support the jury's "yes" finding to Questions 1(a) and 1(b). ......................................49

    B.    *Casteel* also applies to Question 6 regarding damages............55

    C.    The trial court likewise erred in refusing to include a proper instruction in Question 1—to cure the *Casteel* problem. ........................................................................57

III.    For Additional and Separate Reasons, the Judgment Against SDP Should Be Reversed. ......................................................58

    A.    SDP was not a party to the Letter of Intent, but an agent of a disclosed principal. ..........................................58

    B.    The trial court, at the very least, should have submitted a jury question asking whether SDP was a party to the Letter of Intent. ..........................................................59

    C.    The jury's finding in answer to Question 1(b) is not supported by legally or factually sufficient evidence because SDP did not breach any alleged duty that caused any damages. ..........................................................60

IV.    The Fee Award Cannot Stand. ..........................................62

PRAYER ........................................................................................62

CERTIFICATE OF WORD COMPLIANCE..........................................64

CERTIFICATE OF SERVICE ..........................................................64

INDEX TO APPENDIX

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A to Z Rental Ctr. v. Burris*,
714 S.W.2d 433 (Tex. App.—Austin 1986, writ ref'd n.r.e.) ...........................58

*Ashford Partners, Ltd. v. ECO Res., Inc.*,
401 S.W.3d 35 (Tex. 2012).................................................................................62

*Barrera v. Cherer*,
No. 04-13-00612-CV, 2014 WL 1713522 (Tex. App.—San
Antonio Apr. 30, 2014, no pet.) (mem. op.) .................................................27, 28

*Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*,
348 S.W.3d 894 (Tex. 2011) ..............................................................................41

*Benge v. Williams*,
No. 01-12-00578-CV, 2014 Tex. App. LEXIS 12445
(Tex. App.—Houston [1st Dist.] Nov. 18, 2014, no pet.)...................................54

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002).................................................................................29

*Burbage v. Burbage*,
447 S.W.3d 249 (Tex. 2014) ..............................................................................23

*Cain v. Bain*,
709 S.W.2d 175 (Tex. 1986) (per curiam) .............................................18, 28, 61

*Canyon Vista Prop. Owners Ass'n v. Laubach*,
No. 03-11-00404-CV, 2014 Tex. App. LEXIS 1099 (Tex. App.—
Austin Jan. 31, 2014, no pet.) (mem. op) .............................................29, 30, 46

*City of Keller v. Wilson*,
168 S.W.3d 802 (Tex. 2005) .........................................................17, 36, 38, 48

*City of San Antonio v. Pollock*,
284 S.W.3d 809 (Tex. 2009) ..............................................................................35

*Clear Lake City Water Authority v. Kirby Lake Development, Ltd.*,
123 S.W.3d 735 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied)......................................................................................53

*Columbia Rio Grande Healthcare, L.P. v. Hawley*,
284 S.W.3d 851 (Tex. 2009) ........................................18, 55, 57, 60

*Crown Life Ins. Co. v. Casteel*,
22 S.W.3d 378 (Tex. 2000)............................................*passim*

*Daugherty v. So. Pac. Transp. Co.*,
772 S.W.2d 81 (Tex. 1989)................................................46

*DeNucci v. Matthews*,
03-11-00680-cv, 2015 Tex. App. LEXIS 4041 (Tex. App.—Austin
Apr. 23, 2015, no pet.) ....................................................49

*Earle v. Ratliff*,
998 S.W.2d 882 (Tex. 1999) ............................................33

*Elbaor v. Smith*,
845 S.W.2d 240 (Tex. 1992) ............................................60

*Emps. Ret. Sys. of Tex. v. Putnam, LLC*,
294 S.W.3d 309 (Tex. App.—Austin 2009, no pet.)........................19

*Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*,
367 S.W.3d 835 (Tex. App.—Dallas 2012, no pet.) ........................46

*Fiess v. State Farm Lloyds*,
202 S.W.3d 744 (Tex. 2006) ............................................59

*Ford Motor Co. v. Ridgway*,
135 S.W.3d 598 (Tex. 2004) ........................................18, 61

*Great Am. Ins. Co. v. Jim Stephenson Motor Co.*,
No. 05-94-00858-CV, 1996 WL 135688 (Tex. App.—Dallas Mar.
26, 1996, writ denied)....................................................25

*Gulf Ins. Co. v. Burns Motors, Inc.*,
22 S.W.3d 417 (Tex. 2000)............................................25, 28

*Haase v. Glazner*,
62 S.W.3d 795 (Tex. 2001)......................................................................44

*Hancock v. Variyam*,
400 S.W.3d 59 (Tex. 2013)...............................................................22, 23, 24

*Harris Cnty. v. Smith*,
96 S.W.3d 230 (Tex. 2002)...............................................................55, 56

*Haynes & Boone v. Bowser Bouldin, Ltd.*,
896 S.W.2d 179 (Tex. 1995) .............................................................18, 19

*Holland v. Lovelace*,
352 S.W.3d 777 (Tex. App.—Dallas 2011, pet. denied)..........................39, 40

*Holt Atherton Indus., Inc. v. Heine*,
835 S.W.2d 80 (Tex. 1992)...............................................................31, 45, 48

*Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*,
930 S.W.2d 242 (Tex. App.—Houston [14th Dist.] 1996, no writ)...................19

*Ins. Co. of State of Pa. v. Commercial Union Ins. Co.*,
No. 05-95-00471-CV, 1996 WL 732470 (Tex. App.—Dallas Dec.
20, 1996, no writ)......................................................................................28

*JAAV Invs., LLC v. Amcap Mortg., Ltd.*,
No. 14-12-00839-CV, 2014 WL 708492 (Tex. App.—Houston
[14th Dist.] Feb. 20, 2014, no pet.)...............................................................41

*Jelinek v. Casas*,
328 S.W.3d 526 (Tex. 2010) ..........................................................................24

*John H. Carney & Assocs. v. Tex. Prop. & Cas. Ins. Guar. Ass'n*,
354 S.W.3d 843 (Tex. App.—Austin 2011, pet. denied) ................................25

*Kerr-McGee Corp. v. Helton*,
133 S.W.3d 245 (Tex. 2004) ..........................................................................49

*M-I LLC v. Stelly*,
733 F. Supp. 2d 759 (S.D. Tex. 2010)..............................................................28

*Marathon Corp. v. Pitzner*,
106 S.W.3d 724 (Tex. 2003) (per curiam) .................................19, 22, 24, 61

*Mays v. Pierce*,
   203 S.W.3d 564 (Tex. App.—Houston [14th Dist.] 2006, pet.
   denied)...................................................................................................59

*McFarland v. Boisseau*,
   365 S.W.3d 449 (Tex. App.—Houston [1st Dist.] 2011, no pet.)................53, 54

*Natural Gas Pipeline Co. of Am. v. Justiss*,
   397 S.W.3d 150 (Tex. 2012) ..............................................................*passim*

*Osterberg v. Peca*,
   12 S.W.3d 31 (Tex. 2000)............................................................................44, 46

*Peterson v. Kroschel*,
   No. 01-13-00554-CV, 2015 Tex. App. LEXIS 5543 (Tex. App.—
   Houston [1st Dist.] June 2, 2015, no pet.) (mem. op.) ................................44, 45

*Phillips v. Carlton Energy Grp., LLC*,
   No. 12-0255, 2015 Tex. LEXIS 439
   (Tex. May 8, 2015) ............................................................................*passim*

*Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*,
   No. 13-0597, 2015 Tex. LEXIS 558 (Tex. June 12, 2015) ...............................59

*Pool v. Ford Motor Co.*,
   715 S.W.2d 629 (Tex. 1986) ................................................................18, 24, 49

*Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*,
   207 S.W.3d 801 (Tex. App.—Houston [14th Dist.] 2006, pet.
   denied)........................................................................................32, 37, 39, 40

*Romero v. KPH Consol., Inc.*,
   166 S.W.3d 212 (Tex. 2005) ....................................................................51, 56

*Saenz v. Fid. & Guar. Ins. Underwriters*,
   925 S.W.2d 607 (Tex. 1996) ....................................................................29, 47

*Salinas v. Rafati*,
   948 S.W.2d 286 (Tex. 1997) ..............................................................29, 31, 46

*Sand Point Ranch, Ltd. v. Smith*,
   363 S.W.3d 268 (Tex. App.—Corpus Christi 2012, no pet.)............................54

*Spencer v. Eagle Star Ins. Co. of Am.*,
876 S.W.2d 154 (Tex. 1994) ................................................................59

*Spin Doctor Golf, Inc. v. Paymentech, L.P.*,
No. 05-11-01014-CV, 2013 WL 3355199 (Tex. App.—Dallas July
2, 2013, pet. denied) (mem. op.) .........................................................41

*Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*,
184 S.W.3d 840 (Tex. App.—Austin 2006, pet. granted, judgm't
vacated w.r.m.) .......................................................................*passim*

*Stuart v. Bayless*,
964 S.W.2d 920 (Tex. 1998) (per curiam) ...................................41, 43

*Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*,
877 S.W.2d 276 (Tex. 1994) ................................................................32

*Texarkana Mem'l Hosp., Inc. v. Murdock*,
946 S.W.2d 836 (Tex. 1997) ................................................................29

*Texas Comm'n on Human Rights v. Morrison*,
381 S.W.3d 533 (Tex. 2012) (per curiam) ...................................52, 53

*Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*,
403 S.W.3d 547 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ............32, 46

*Wal-Mart Stores, Inc. v. Merrell*,
313 S.W.3d 837 (Tex. 2010) (per curiam) .........................................38

*Wheelways Ins. Co. v. Hodges*,
872 S.W.2d 776 (Tex. App.—Texarkana 1994, no writ) ...............25, 28

*Wingate v. Hajdik*,
795 S.W.2d 717 (Tex. 1990) ................................................................27

**Rules and Statutes**

Tex. Bus. Orgs. Code § 101.106(b) ........................................................28

Tex. Civ. Prac. & Rem. Code § 38.001 ..................................................62

Tex. R. App. P. 44.1(a) ....................................................................55, 57

Tex. R. App. P. 44.1(a)(1) ......................................................................60

Tex. R. App. P. 44.1(a)(2) ...................................................................................55

Tex. R. Civ. P. 277...................................................................................51

Tex. R. Civ. P. 278...................................................................................51, 60

**STATEMENT OF THE CASE**

*Nature of the Case:*   This case arises from a September 15, 2009 letter of intent ("*Letter of Intent*"). At that time, Robert Berry and Keith McDonald were principals of plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("*LTT*"), a tenant under a commercial real estate lease (the "*Lease*") for a yet-to-be-completed long-term acute care hospital. Berry and McDonald entered into the Letter of Intent with Lakeway Regional Medical Center LLC ("*Lakeway Regional*"). PX-2. The stated purpose of the Letter of Intent was to establish "ground rules" for exchanging information so that Lakeway Regional could decide whether to acquire the Lease from LTT. *Id.*

Lakeway Regional ultimately decided not to acquire the Lease, and this lawsuit ensued. LTT, as assignee of the rights of Berry and McDonald, asserted a claim for breach of contract against Lakeway Regional and its agent, Surgical Development Partners, LLC ("*SDP*"). (Lakeway Regional and SDP are sometimes referred to collectively as "*Appellants*.") LTT also alleged that Lakeway Regional and SDP misappropriated trade secrets and made negligent misrepresentations. CR4, 158. LTT later added Frank T. Sossi, and his law firm, Brennan, Manna & Diamond, as defendants (sometimes referred to herein as "*Attorney Defendants*"). CR122, 158.

*Trial Court:*   345th Judicial District Court, Travis County, Texas Honorable Lora J. Livingston, presiding.[1]

---

[1] Judge Livingston presided over the trial. Other judges ruled on pretrial matters. For example, the Honorable Stephen Yelenosky signed an order granting partial summary judgment to SDP and Lakeway Regional. CR12267.

| | |
|---|---|
| *Course of Proceedings:* | By orders dated July 16, 2014, the trial court (1) granted summary judgment for Lakeway Regional and SDP on LTT's misappropriation claim; (2) granted in part and denied in part, Lakeway Regional's and SDP's motions for summary judgment on LTT's breach of contract claim; (3) granted in part and denied in part Lakeway Regional's and SDP's motions for summary judgment on LTT's negligent misrepresentation claim; and (4) granted summary judgment for the Attorney Defendants. CR12251, 12266; 1SCR201-02.

In August 2014, LTT's claims for breach of contract and negligent misrepresentation asserted against Lakeway Regional and SDP were tried to a jury. SCR3. The jury found in LTT's favor on its breach of contract claim and awarded LTT $7.9 million in damages for loss in the fair market value of LTT and $790,000 in damages for the loss in fair market value of LTT's confidential information. CR13000, 13006. The jury found against LTT on its negligent misrepresentation claim. CR13003. |
| *Disposition:* | The trial court denied Lakeway Regional's and SDP's motion to disregard certain jury findings. CR13010; 1SCR287. Based on LTT's election to recover the amount awarded for the loss in its fair market value (1SCR250; CR13235), the Judgment awards LTT $7.9 million in damages, $2 million in attorneys' fees (the amount established pursuant to a stipulation, CR13240), pre- and post-judgment interest, and costs. SCR3. Lakeway Regional's and SDP's motion for new trial (CR13320) was overruled by operation of law. Lakeway Regional, SDP, and LTT each appealed. CR13328; SCR6. |

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument would assist the Court in resolving Appellants' legal and factual insufficiency challenges and charge error complaints. Furthermore, because LTT has cross-appealed, this case has complexity, providing an additional basis for having oral argument.

## ISSUES PRESENTED BY APPELLANTS

1. ***Legal and factual sufficiency challenges.*** Should the trial court's judgment against Lakeway Regional and SDP be reversed because there is not legally or factually sufficient evidence to support this judgment on at least one of the following grounds?

    (a) LTT argued that Appellants' communications to HUD about LTT caused HUD's decision to insure Lakeway Regional's loan and later defend that decision, thus permitting Lakeway Regional to beat LTT to market. When a causation theory hinges on a third party's decision, the Texas Supreme Court requires evidence of why the decision was made. No witness testified and no exhibits support ***why*** HUD decided to insure the loan or defend that decision or ***what*** information HUD considered when making those decisions. Was there legally or factually insufficient evidence that Appellants caused, under that or any other theory or basis, the damages claimed by LTT or awarded by the jury in answers to Questions 6(1) and 6(3)?

    (b) Was the evidence legally or factually insufficient to support the jury's damages awards of $790,000 and $7.9 million in answer to Questions 6(1) and (3), and are the awards excessive?

        (i) LTT is an assignee of rights under the Letter of Intent. An assignee can only recover damages sustained by the assignor. LTT only put on evidence of its own damages, however. No witness testified about and no exhibit addresses the damages sustained by the assignors. Was the evidence legally or factually insufficient to support the damages awards to LTT, the assignee?

        (ii) LTT was awarded $7.9 million for its loss in fair market value. The law requires that the damages award be linked to evidence, that loss in value be proven with reasonable certainty, and that the evidence of the amount of the loss not be conclusory or speculative. LTT's damages evidence failed on all counts. For example, no witness testified and no exhibit supports that LTT sustained a loss in value of $7.9 million, however, and the only evidence of its lost value was a $13.8 million loss, which was not fully explained to the jury. Was the evidence legally or factually insufficient to support the $7.9 million award?

(iii)	To recover the loss in fair market value of LTT, that loss had to be a foreseeable consequence of breaching the Letter of Intent. The Letter of Intent does not describe what consequential damages were foreseeable, and no witness testified that anyone contemplated that the value of LTT (a non-party to the Letter of Intent) would be diminished or rendered worthless by a breach. Was the evidence legally or factually insufficient to establish that the loss in the fair market value of LTT was foreseeable?

(iv)	The jury awarded LTT $790,000 in loss in fair market value of its confidential information. Again, a damage award must be linked to the evidence. No witness testified that the fair market value of LTT's confidential information was diminished by $790,000, and no exhibit supports this figure. The only evidence of this loss was $7.9 million. Was the evidence legally or factually insufficient to support the jury's $790,000 award?

2.	***Charge error.***	Should this judgment be reversed and remanded for a new trial because of one of the following errors in the charge?

(a)	Under *Casteel*, a liability question cannot commingle valid with invalid liability theories. Appellants obtained summary judgment on LTT's claim for breach of Section 2 of the Letter of Intent. The trial court, over Appellants' objection, submitted LTT's breach of contract claim to the jury using broad-form submission, which encompassed a breach of Section 2. Did the trial court err by submitting a broad-form liability question in Question 1?

(b)	Under *Casteel*, a damages question cannot be predicated on a finding of an invalid liability theory. The trial court, over Appellants' objection, submitted the damages question without asking the jury to award damages connected to breaches of specific provisions of the Letter of Intent. Did the trial court err in how it submitted the damages question in Question 6?

(c)	Similarly, the trial court refused to instruct the jury that in deciding liability, the jury had to find (among other things) a valid, enforceable agreement between the parties. This instruction would have limited the jury to the enforceable sections of Letter of Intent and not

encompassed Section 2, which was unenforceable.  Did the trial court err in refusing this instruction?

3.  ***Matter of law, legal sufficiency, and factual sufficiency challenges by SDP only.***

    (a)  As a matter of law, an agent is not contractually liable for the acts of its disclosed principal.  SDP owed no duty under the Letter of Intent.  The Letter of Intent expressly identified SDP as the agent of Lakeway Regional, but the judgment imposes liability on SDP.  Should the judgment against SDP be reversed because LTT's breach of contract claim against SDP fails as a matter of law, rendering the jury's answer to Question 1(b) immaterial?

    (b)  LTT argued that Appellants' communications about LTT to HUD caused LTT's injuries.  The only HUD witness testified that he understood that the communications about LTT were sent on behalf of Lakeway Regional.  No witness testified that SDP sent any communication to HUD about LTT that caused HUD to insure Lakeway Regional's loan or later defend that decision.  Was there legally or factually insufficient evidence that SDP breached any alleged duty that caused injury to LTT?

4.  ***Charge error challenges by SDP only***.  The parties offered conflicting testimony about whether SDP was a party to the Letter of Intent.  The trial court refused to submit a question asking whether SDP was a party or to instruct the jury that it had to find that SDP was a party to the Letter of Intent before it could find that SDP breached the Letter of Intent.  Did the trial court err in refusing this question and instruction?

5.  ***Attorneys' fees***.  The parties stipulated, subject to their right to appeal, to the amount of reasonable attorneys' fees to award against Appellants, which the trial court awarded.  Because the jury's liability and damages findings are not supported by legally or factually sufficient evidence, should the award of attorneys' fees be vacated?

## RECORD REFERENCES

The Clerk's Record filed June 16, 2015 is cited as "CR." The Supplemental Clerk's Record filed June 18, 2015 is cited as "SCR." The Supplemental Clerk's Record filed July 17, 2015 is cited as "1SCR." The Reporter's Record is cited by volume and page number, i.e., RR6:105. The video depositions played to the jury are cited as "CE_" followed by the hour, minute and second.

**STATEMENT OF FACTS**

**I.    Congressional action impacts two potential Texas hospitals.**

**A.    Construction of Lake Travis Specialty Hospital began in 2008.**

In 2004, Robert Berry and Keith McDonald began planning the development of a 57,000 square-foot, 46-bed hospital in Lakeway, Texas, which would be known as Lake Travis Specialty Hospital. CR163; RR6:88, 93. Their plan was to initially operate this facility as a ***long***-term acute care hospital, a type of hospital with which they had substantial recent experience. CR163; RR6:73-79, 82-87, 96-97; DX-13. A ***long***-term acute care hospital cares for patients who stay on average more than 25 days. Conversely, a ***short***-term acute care hospital (also referred to as a general acute care hospital) cares for patients who stay on average under 6 days. RR6:75. Berry and McDonald contributed $6.35 million to the project (RR8:106), but that was just a fraction of the amount they needed.

In September 2007, Berry and McDonald obtained $21 million in construction financing through a 20-year ground Lease with HCN Interra Lake Travis LTACH, LLC, a joint venture between HCN Interra and Health Care REIT, Inc. ("***HCN***"). RR6:122-25; PX-338. The Lease had many of the same attributes as a loan. RR6:123. Right before the Lease was signed, Berry and McDonald created plaintiff LTT to be the tenant. RR6:97. Construction of Lake Travis Specialty Hospital began in 2008. RR6:88.

LTT then hit a roadblock. Effective December 31, 2007, Congress imposed a three-year moratorium on licensing long-term health care facilities. RR6: 127-28; RR12:147. After learning that their project was not eligible for grandfather status under the moratorium, Berry and McDonald changed gears and decided to operate Lake Travis Specialty Hospital solely as a general acute care facility. RR6:127-30.

HCN became concerned about whether Berry and McDonald had enough experience to operate a general acute care facility. RR9:145-46, 156-57; CE1:34m:05s–34m:44s; PX-359. That concern stemmed from the fact that neither of them had worked at or operated a general acute care hospital since 1996 and had never started one. CE1:34m:05s–34m:44s; RR6:69-73, 82; RR9:11-13.

### B. Others began planning a hospital—Lakeway Regional Medical Center—in 2008.

Berry and McDonald were not the only ones working on a hospital project in Lakeway. Another group was planning a hospital, although a considerably larger one. In 2008, Appellant Lakeway Regional was formed by three Lakeway physicians and a local businessman to start a 244,000 square-foot, 106-bed physician-owned general acute care facility in Lakeway, which would be known as Lakeway Regional Medical Center. RR10:158-59; RR11:130-31; PX-49. Lakeway Regional retained Appellant SDP to assist with financing and opening the proposed hospital. RR10:157-59; DX-18; PX-49; PX-167.

However, in early 2009, Lakeway Regional began to see its own governmental roadblock. As part of legislation that ultimately became the Patient Protection and Affordable Care Act in March 2010, Congress was considering a ban on physician-owned hospitals. RR11:9, 136-37. Lakeway Regional began to develop contingencies for the passage of this ban.

## II. Berry, McDonald, and Lakeway Regional decide to explore the feasibility of Lake Travis Specialty Hospital becoming Lakeway Regional Medical Center's initial campus.

In March 2009, Frank Sossi, an attorney for Lakeway Regional, contacted Scott Brinker, with Health Care REIT, with whom he had a prior business relationship, to see if Brinker had any ideas about preserving the physician-ownership component structure for Lakeway Regional. RR12:81-83, 143-45; *see also* RR11:138-41. Sossi, already aware of LTT's project, learned that Health Care REIT had concerns about Berry's and McDonald's lack of experience in opening and operating a general acute care hospital, and that the landlord was looking to replace LTT as the tenant. RR12:143-49; *see also* RR11:141-44, 177-79; PX-359; DX-30.

Lakeway Regional began considering whether Lake Travis Specialty Hospital, already under construction, could be an initial campus for its medical center while its main campus was under construction, thereby avoiding the potential ban on physician ownership. RR8:186-87; RR11:7-10, 152-54;

RR12:143-46, 165. After HCN's introduction, SDP CEO Eddie Alexander contacted LTT. RR6:132-33; RR11:7. On May 11, 2009, SDP and LTT entered into a confidentiality agreement[2] so that SDP could conduct initial due diligence for Lakeway Regional. PX-4. A few months later, the parties moved to the next step, which was to enter into a Letter of Intent.

### III. A Letter of Intent is signed, and Lakeway Regional considers whether to acquire the Lease from LTT.

On September 15, 2009, a 7-page "Letter of Intent for the Acquisition of the Lakeway Hospital Lease" was executed. Its stated purpose was to "establish the ground rules for the ongoing exchange of information between the Parties" so that a decision could be made on whether Lakeway Regional would acquire the Lease from LTT. PX-2.

As originally drafted, LTT was to be a party to the Letter of Intent, but LTT's counsel struck LTT as a party and inserted Berry and McDonald in its place. RR12:174-75; PX-64; PX-69. Lakeway Regional is also a party to the Letter of Intent. PX-2. SDP is identified "as the agent" for Lakeway Regional. *Id.*

The Letter of Intent addresses a variety of topics. For example, Section 1 specifies a 45-day period for discussions and negotiations. This time period was extended by Berry, McDonald, and Lakeway Regional. RR9:134. Section 2 sets forth Lakeway Regional's obligations if it decided to acquire the Lease, including

---

[2] LTT did not assert a claim for breach of this agreement. CR171-72; CR13000.

53883200                                    4

that it would reimburse Berry and McDonald reasonable and documented costs advanced by them plus pay them $1.5 million. The total payments contemplated by Section 2 are approximately $7.9 million. RR8:106; RR9:210; RR12:170-71; RR13:104-06.[3] Section 3 provides the conditions precedent and a "best efforts" requirement to complete Section 2. Sections 6 and 9 contain good faith, standstill, non-circumvention, and confidentiality provisions whereby the parties agreed not to share with third parties certain information gained from the negotiations and to use proprietary information and knowledge gained in the Project discussions only to evaluate the feasibility of the Project.

The Letter of Intent, however, provided several exceptions to the confidentiality requirements. First, any information that was in the public domain was excluded from the requirements. Second, information that was already in the other party's possession was also not considered proprietary. Third, information that was lawfully received from a third party without restriction on further disclosure was excluded as well. PX-2.

As plainly stated in the Letter of Intent, Lakeway Regional was not required to acquire or to assume the Lease. Instead, the Letter of Intent provided a process by which the parties could evaluate whether Lakeway Regional would do so, and contained terms that would protect the parties' respective interests during and after

---

[3] The $7.9 million contemplated consideration under the Letter of Intent is also the same amount the jury found as the loss in value in LTT. CR13006.

5

that process. As Berry's and McDonald's counsel for the Letter of Intent candidly agreed, "there was a possibility that the deal wasn't going to happen from the date that the letter of intent was signed." CE3:01h:09m:25s-30s; *see also* RR11:189.

After signing, Lakeway Regional continued to evaluate whether it made sense to acquire the Lease. In addition to reviewing additional information provided by LTT, Lakeway Regional began to identify any needed modifications to transform LTT's building (which was initially designed as a long-term acute care facility) into a general acute care facility that suited Lakeway Regional's business model. RR6:161; RR8:148-51; RR11:181-82, 187-88, 193-94; PX-32; PX-353-58; PX-368; DX-45; DX-70; DX-91.

## IV. Lakeway Regional decides against acquiring the Lease.

In March 2010, after protracted discussions, Lakeway Regional decided not to acquire the Lease. *E.g.*, RR11:184-85. Reasons included that no plausible use had been identified for Lake Travis Specialty Hospital after Lakeway Regional's main campus opened. RR11:184, 205. Also, Lakeway Regional and HCN could not agree on financial terms. RR6:91; RR11:204-09; RR12:170-73; PX-35; DX-94; DX-105; CE1:53m:24s–54m:20s. By March 22, 2010, Berry and McDonald knew of the decision, and the Letter of Intent was terminated. RR6:91-92; PX-35; PX-166; DX-98.

**V.  In March 2010, Lakeway Regional secures a HUD-insured loan for its own project; Sossi sends his "May 10 email" two months later.**

After the Letter of Intent terminated, Lakeway Regional continued to move forward with its project—and was able to see it through to completion. Its ability to proceed in an extraordinarily challenging financial market following the recession of 2008 was the result of its participation in a HUD program available to new hospitals located in underserved communities. RR11:215-16.

Lakeway Regional had applied for HUD loan insurance in 2009. PX-55; RR10:170-73. After almost a year, on March 17, 2010, HUD approved the application and issued a Commitment. PX-84; PX-430. On April 30, 2010, Lakeway Regional submitted the final adjustments to the closing documentation, including a reduction in the interest rate. PX-85. As of that date, no one from Lakeway Regional or SDP had disclosed any information about LTT or its proposed facility to anyone at HUD. RR10:11.

On May 8, 2010, Rip Miller, CEO of Westlake Hospital, sent HUD an email questioning HUD's determination that the proposed site of Lakeway Regional was in an underserved area given the proximity of then-under-construction Lake Travis Specialty Hospital. PX-179. A HUD staff member emailed Lakeway Regional's lender a list of eight questions about Lake Travis Specialty Hospital. RR10:16-17; RR12:113-14; PX-180.

In an email dated May 10, 2010 ("*May 10 email*"), Sossi answered HUD's questions. PX-180. (This email became the focus of LTT's claim that Appellants breached the Letter of Intent's non-circumvention and confidentiality provisions. *E.g.*, CR169; RR6:92-93.) On May 11, 2010, a HUD staffer responded to Miller's email. PX-179. On May 21, 2010, the HUD-insured loan closed. RR10:18-19; PX-86; PX-115.

Two years later, in April 2012, Lakeway Regional Medical Center began providing health care to the residents of West Austin and surrounding areas. RR13:147-49.

## VI. LTT completes construction of Lake Travis Specialty Hospital, but it does not open.

While Lakeway Regional considered whether to acquire the Lease, Berry and McDonald continued to solicit other possible investors for their project. These efforts were unsuccessful. RR6:185-87; RR9:146-47; DX-75. After the Letter of Intent was terminated, Berry and McDonald attempted to press ahead with their project. RR6:221-22. HCN did not support their plan. According to Berry, Lake Travis Specialty Hospital could have opened, but HCN preferred it not do so unless Berry and McDonald partnered with an investor/operator with more general acute care hospital experience, which Berry was unable to find. RR8:66-69, 162; RR9:11-12, 152, 156-57; DX-98; DX-106; *see also* CE4:01m20s-02m:15s. In

8

2012, after a default by LTT, HCN terminated the Lease.  CE1:01h:02m:53s–01h:03m:53s.

## VII. The lawsuit, summary judgment orders, trial, and judgment.

### A. LTT sues Lakeway Regional, SDP, and Attorney Defendants.

In April 2012, the same month that Lakeway Regional Medical Center began admitting patients, LTT, as the assignee of Berry and of McDonald's estate,[4] filed this lawsuit against Lakeway Regional and SDP asserting breach of contract and misappropriation of trade secrets.  CR4; PX-421.  LTT later added the Attorney Defendants, claiming that they also misappropriated LTT's trade secrets, and it amended its petition to add a negligent misrepresentation claim.  CR122.

LTT's live petition alleged that Lakeway Regional and SDP breached the Letter of Intent by, among other actions: (1) failing to acquire or assume the Lease and pay the amounts due upon assumption of the Lease as set forth in Section 2; (2) breaching the standstill and non-circumvention provisions in Section 6; and (3) making improper disclosures of confidential information to third parties, including HUD, in violation of Sections 6 and 9.  CR158, 171-72.  LTT claimed that use and disclosure of LTT's confidential and proprietary information by Lakeway Regional and SDP to HUD caused HUD to issue, amend, close, and defend (i.e., not revoke) the loan insurance for Lakeway Regional.  CR167-72; *see*

---

[4] McDonald passed away in July 2011.  CR163; RR6:98.

*also* CR11793; 1SCR230-36; RR6:92-93. LTT further claimed that all defendants misappropriated its trade secrets and made negligent misrepresentations. CR172-74.

**B.    The trial court grants partial summary judgment for Lakeway Regional and SDP and complete summary judgment for the Attorney Defendants.**

Lakeway Regional moved for summary judgment on the grounds that: (1) Section 2 of the Letter of Intent (concerning acquisition of the Lease) was unenforceable; and (2) it was entitled to summary judgment as a matter of law on LTT's misappropriation and negligent misrepresentations claims. CR5602. SDP moved for summary judgment on the same grounds, as well as the ground that it was not a party to the Letter of Intent and therefore could not be liable for any alleged breach. CR6020, 6035-38. The Attorney Defendants moved for summary judgment on all claims asserted against them. CR5229.

The trial court, Judge Stephen Yelenosky then presiding, granted summary judgment in favor of all defendants on LTT's misappropriation claims. CR12266; 1SCR201-02. He also granted summary judgment to Lakeway Regional and SDP on LTT's claim that they had breached Section 2 of the Letter of Intent by not acquiring the Lease and granted, in part, defendants' summary judgment motion on LTT's negligent misrepresentations claim. CR12266. He denied the motions in all

other respects.  *Id.*; *see also* CR12251  The Attorney Defendants were then dismissed completely.

## C.    The case proceeds to trial; LTT prevails on its contract claim.

*Trial.*  The case was tried by Judge Lora Livingston in August 2014.  SCR3. With respect to LTT's breach of contract claim, Berry linked only a few of Sossi's answers in the May 10 email to confidential or proprietary information he and McDonald had provided to Appellants under the Letter of Intent.  Those answers (hereafter "***Sossi answers at issue***") concerned the size of Lake Travis Specialty Hospital, the expense of converting it from a long-term health care facility to a general acute care facility, zoning, adequacy of parking, code issues, and the general terms of the Lease.  *See* RR6:140, 181, 214-15, 229-30; RR8:24, 30-32, 42-43, 48; RR9:59-69.

Berry admitted that LTT did not provide Lakeway Regional with the information that was the basis of some Sossi answers at issue, admitted that he disagreed with the substance of other answers, and admitted that some answers were subjective or opinion.  RR6:179, 181, 229-30; RR8:30-32, 42-43, 48; RR9:59-69.  Regardless, LTT claimed that Appellants' use of LTT's confidential or proprietary information in their communications with HUD in violation of Sections 6 and 9 enabled Lakeway Regional to open, which "doomed" LTT's

ability to obtain investors for its project. *E.g.*, RR8:68-69, 162; RR13:123; CR170; 1SCR252.

LTT sought three categories of damages for the alleged breach: (1) loss in the fair market value of LTT, (2) loss in the fair market value of LTT's confidential information, and (3) lost profits. Berry testified as to all three categories, and LTT's expert, Dr. Tom Glass, also provided his opinion on lost profits. RR8:82-83, 100-06, 161-62; RR13:27.

***Charge conference.*** At the charge conference, Appellants objected to the use of broad form submission for LTT's breach of contract and damages claims. This objection was founded, in large part, on Judge Yelenosky's prior holding that LTT's claim that Appellants breached Section 2 of the Letter of Intent was invalid, thus requiring a granulated charge. Appellants' objections and requested instruction were denied. RR14:30-31, 35; CR12972; *see also* CR12979.

SDP separately requested that the jury be asked to determine whether SDP was a party to the Letter of Intent, and it submitted a proposed question and instruction. Those requests were also refused. CR12971-72; RR14:30-31.[5]

***Jury findings.*** The jury found against LTT on its negligent misrepresentation claim. CR13003. But it found that Lakeway Regional and SDP each breached the Letter of Intent (although which section it found they breached,

---

[5] The trial court also refused every other proposed question and instruction (save statute of limitations) tendered by Appellants. CR12960-61, 12970, 12973-76.

12

because of broad form submission, is unknown). CR13000. The jury awarded LTT $7.9 million for the loss in LTT's fair market value, $790,000 for the loss in the fair market value of LTT's confidential information, and $0 in lost profits. CR13006. The jury's awards did *not* match any of the damages evidence presented by LTT. The following table identifies the category of damages, the amount claimed at trial, and the amount awarded:

| Category | Claim | Award |
|---|---|---|
| Loss in fair market value of LTT | $13.8 million | $7.9 million |
| Loss in fair market value of LTT's confidential information | $7.9 million | $790,000 |
| Lost profits | $34.5 million | $0 |

RR8:101-06, 161-62; RR9:165; RR13:27; CR13006. Notably, $7.9 million was the exact amount that LTT claimed it was owed under Section 2 of the Letter of Intent. RR8:106; RR13:104-06; CR13206.

### D. The post-verdict orders and judgment.

The trial court denied Appellants' motion to disregard certain jury findings, allowed their motion for new trial to be overruled by operation of law, and consistent with LTT's election, rendered judgment for LTT in the amount of $7.9 million. CR13010, 13235, 13320; SCR3; 1SCR250, 287. The trial court further

awarded LTT stipulated attorneys' fees, interest, and costs.  CR13235, 13240; SCR3.

## SUMMARY OF ARGUMENT

There are many grounds on which this judgment should be reversed in Appellants' favor.

***No causation exists for LTT's contract claim.***  LTT failed to prove that Appellants breached some duty that ***caused*** LTT the damages the jury awarded. Although LTT may bluster that the jury found that LTT's "confidential" or "proprietary" information was used, this case essentially boils down to a handful of statements contained in a single e-mail to HUD, none of which LTT showed were the cause of anything HUD did or did not do.  Proving the cause of HUD's actions is the lynchpin of LTT's case because its theory is that the communications to HUD caused HUD to amend, close, and/or "defend" (i.e., not revoke) the loan insurance Commitment, which then permitted Lakeway Regional to open and competitively force LTT out of the market.

But LTT presented no evidence addressing why HUD amended/closed/did not revoke the Commitment, who at HUD made those decisions, or what information that unnamed person (or persons) relied on in making those decisions. Indeed, although a HUD witness testified at trial by deposition, his testimony did not address—much less answer—any of these critical questions.  The jury was thus

left to speculate as to why HUD took the actions it did and to impermissibly assume that HUD did so based on the Sossi answers at issue or other communication with Appellants about LTT. Under Texas Supreme Court precedent, the absence of evidence regarding whether HUD actually relied upon the Sossi answers at issue, or any other communication with Appellants, when making its decisions is fatal to the judgment. Simply put, there is insufficient evidence that any breach of the Letter of Intent caused the damages awarded, under any theory presented at trial, requiring that the judgment be reversed and rendered in Appellants' favor.

*Damages awards are not supported.* LTT's damages evidence was also speculative in nature, and legally and factually insufficient to sustain the judgment. *First,* LTT (a non-party to the Letter of Intent) brought this case as an assignee of Berry and McDonald (the actual parties to the Letter of Intent). LTT was therefore required to prove damages incurred by its assignors. LTT failed to do so because it focused at trial solely on the damages that it purportedly sustained. LTT has no legal right to recover those damages because it was not a party to the Letter of Intent. The Court should reverse and render on this narrow issue alone.

*Second*, the damage awards also cannot stand for numerous other reasons. LTT elected to recover the $7.9 million award for the loss in its fair market value,

but no witness testified and no exhibit shows that the value of LTT was diminished by $7.9 million.

Next, the only evidence of lost value—an opinion supplied by Berry—was $13.8 million. But his opinion was conclusory, speculative, and lacking in reasonable certainty. For example, the backbone of Berry's testimony was a *pro forma* that presumed a 38-bed hospital (rather than the as-built 46-bed hospital) and contained a series of unexplained revenue and expense projections. These projections and Berry's testimony did not, however, place the lost value of LTT anywhere near the $7.9 million awarded.

To be sure, a $7.9 million figure was raised in other contexts. For example, Berry testified that $7.9 million was the loss in value of LTT's confidential information, but that loss was the subject of a different damage award, for which the jury awarded only $790,000. (Thus the award for loss in value of the information was also not tied to any evidence.) Most notably, though, the evidence showed that $7.9 million was the amount that Berry and McDonald would have received if Lakeway Regional assumed the Lease under Section 2 of the Letter of Intent. Because Judge Yelenosky held on summary judgment that Section 2 was an unenforceable promise, that damage model and figure should not have been available at trial. But it was—in violation of *Casteel*.

***Charge errors.*** The trial court erred in submitting a broad form liability question over Appellants' objections. The question permitted the jury to find Appellants liable under Section 2 for not assuming the Lease. Given that no witness testified that LTT was worth $7.9 million (or anywhere close to it), it thus appears that the jury improperly relied upon this evidence and awarded LTT the amount of money due had Lakeway Regional elected to acquire the Lease under Section 2. Harm is presumed here.

And the charge errors did not stop there. The Letter of Intent expressly states that SDP was acting as agent for Lakeway Regional, and the evidence conflicted on whether SDP was a party to the Letter of Intent. Despite this conflict, the trial court refused to submit a question asking whether SDP was a party to the Letter of Intent.

For these and others reasons explained below, the Court should reverse the trial court's judgment and render judgment in favor of Appellants, or in the alternative, remand the case for a new trial.

## STANDARDS OF REVIEW

***Legal and Factual Sufficiency of the Evidence.*** The standard for reviewing the legal and factual sufficiency of the evidence is well established. The test for legal sufficiency is whether "the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168

S.W.3d 802, 827 (Tex. 2005). "Evidence that is so slight as to make any inference a guess is in legal effect no evidence." *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004). On factual sufficiency review, the Court must set aside the verdict if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Pool v. Ford Motor Co.*, 715 S.W.2d 629, 635 (Tex. 1986); *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam).

***Charge Error.*** An appellate court will reverse a judgment for a charge error if that error was harmful because it "probably caused the rendition of an improper judgment or probably prevented the petitioner from properly presenting the case to the appellate courts." *Columbia Rio Grande Healthcare, L.P. v. Hawley*, 284 S.W.3d 851, 856 (Tex. 2009). "Charge error is generally considered harmful if it relates to a contested, critical issue." *Id.* But "when a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Crown Life Ins. Co. v. Casteel*, 22 S.W.3d 378, 388 (Tex. 2000). These standards are also well established.

**ARGUMENT**

I.     **The Jury's Verdict Is Not Supported by Legally or Factually Sufficient Evidence**.

A.     **The evidence is insufficient to show that any alleged breach of the Letter of Intent *caused* the damages awarded to LTT.**

To obtain a judgment on a breach of contract claim, a plaintiff must prove, among other elements, that the defendant's breach caused the plaintiff monetary injury. *Haynes & Boone v. Bowser Bouldin, Ltd.*, 896 S.W.2d 179, 181 (Tex. 1995) (plaintiff must "establish a direct causal link between the damages awarded, the actions of the defendant and the injury suffered"). The failure to prove this element is fatal. *Emps. Ret. Sys. of Tex. v. Putnam, LLC*, 294 S.W.3d 309, 318 (Tex. App.—Austin 2009, no pet.); *see also Houston Mercantile Exch. Corp. v. Dailey Petroleum Corp.*, 930 S.W.2d 242, 248 (Tex. App.—Houston [14th Dist.] 1996, no writ) ("in order to recover any type of damages," plaintiff must prove "a direct causal link between the damages awarded, the actions of the defendant and the injury suffered"); CR13006 (Question 6 asking what "sum of money . . . would fairly and reasonably compensate LTT for its damages, if any, that ***resulted from*** [Lakeway Regional] and/or SDP's failure to comply with the Letter of Intent") (emphasis added). The link between the defendant's actions and the injuries suffered cannot be established "by mere conjecture, guess, or speculation." *Marathon Corp. v. Pitzner*, 106 S.W.3d 724, 727 (Tex. 2003) (per curiam).

LTT failed to prove the causal link with legally or factually sufficient evidence of its two damage claims. LTT premised both damage claims on the same theory:

> BREACH: Appellants used LTT's confidential information to craft communications to HUD, thereby breaching the Letter of Intent;
>
> RESULT: HUD relied upon the information provided about LTT when deciding to amend, close, or defend its prior Commitment to provide loan insurance for Lakeway Regional, which in turn prevented Lake Travis Specialty Hospital from opening.

Under this scenario, LTT was required to present evidence that Appellants' communications with HUD, in breach of Sections 6 and 9[6] of the Letter of Intent (including, specifically, the May 10 email), *caused* HUD to issue the Commitment, agree to the amendment requested by Lakeway Regional, and close and/or defend the loan. LTT did not establish this nexus, nor any other causal nexus.

*Commitment evidence.* On March 17, 2010, HUD issued the loan insurance Commitment. RR10:10-11; PX-84; PX-430. As of that date, neither Appellant had ever communicated with HUD about LTT. RR10:11, 14. Thus, the Sossi answers at issue in the subsequent May 10 email could not have impacted HUD's decision to issue the Commitment.

---

[6] Post-verdict, LTT also claimed that the evidence supported a finding that Appellants breached Section 5, which provides that the provisions related to sharing of information gained during negotiations survive termination (1SCR278-79), but that claim is no different than the claim that Appellants breached Sections 6 and 9.

***Amend and close evidence.*** The loan was amended on May 20, 2010 and closed on May 21, 2010. RR10:18-19; RR11:84; PX-86. The first LTT-related communication between Lakeway Regional and HUD was the May 10 email. LTT presented no evidence as to whether this email affected HUD's decision-making with respect to amending and closing. Most critically, LTT did not present any evidence of HUD's decision-making process, including evidence of the information HUD actually considered in deciding to close.

***Defend evidence.*** LTT also claimed that Appellants' conduct caused HUD to defend the loan. 1SCR252. But this theory required the jury to speculate that HUD's decision to defend was based on communications from Sossi (*e.g.*, PX-136), when the record instead showed that LTT itself was communicating with HUD. *E.g.*, PX-181. Thus, for all we know, when HUD defended the loan post-closing, it did so based on information LTT provided. That is, HUD was getting information from others besides Appellants, and there is no evidence of how any of the information influenced HUD's decision to defend the loan.

LTT recognized this evidentiary gap at trial by complaining that HUD refused to answer certain written deposition questions. RR7:42-45. LTT went so far as to insist that HUD's preliminary statement to its answers be read to the jury, which included a statement that HUD could not be required to provide testimony and that it had decided not to answer questions it deemed irrelevant, burdensome,

21

or called for privileged information "pursuant to Deliberative Process Privilege." RR7:45-47; RR10:7-8. In the absence of any direct evidence on these issues, the jury was left to speculate about the information HUD considered when making its decisions. Speculation, however, cannot fill the evidentiary hole. *Marathon Corp.*, 106 S.W.3d at 727.

Nor does any circumstantial evidence fill the hole. For example, that HUD asked Sossi to answer questions about LTT after receiving Miller's email (PX-180) does not make it more or less likely that HUD decided to close based on Sossi's response, as LTT argued below (1SCR234-35).

Highly instructive is *Hancock v. Variyam*, 400 S.W.3d 59 (Tex. 2013), which held that when there are multiple possible inferences for why a particular decision is made (here, the basis for the decision made by an unknown HUD decision-maker(s)), a jury may not infer that any particular reason (here, Sossi's email) was ***the*** reason on the basis of "circumstantial evidence." *Id.* at 70-71. In *Hancock,* a physician claimed that the submission of a defamatory letter to an accrediting body, which later denied the doctor's accreditation, provided evidence of reputation damages. *Id.* at 62-63, 70. The Court held that the jury could not infer why the accrediting body denied the application because "there were multiple possible grounds for the accrediting body denying accreditation," but the plaintiff-physician "offered no evidence that the inference regarding the letter was more

probable than other possible inferences." *Id.* at 71. This holding rested on the "equal inference rule, which provides that a jury may not reasonably infer an ultimate fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Id.* at 70-71 (citation omitted).

The similarities of this case to *Hancock* are apparent. In both cases, there is no direct evidence of why a decision on a particular application was made by a third party. In both cases, information was provided by the defendants that the plaintiff contended influenced the decision. In both cases, there was no evidence that the decision-maker considered the information (or more importantly what, if any, weight was given to the information). And in both cases, there are multiple possibilities for why the decision was made, which (at best) were supported by meager circumstantial evidence and none of which were more probable than any other possibility.

As in *Hancock*, this Court should hold that there is no legally sufficient evidence to support one of those possibilities—that is, there is no legally sufficient evidence that the Sossi answers at issue in the May 10 email or any other communication between HUD and either Appellant caused HUD to issue, amend, close, or defend the Commitment. *See also Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014) (holding jury could not reasonably infer that cancellations for a

funeral home business were caused by defamation when "any number of reasons" could have caused the cancellations); *Jelinek v. Casas*, 328 S.W.3d 526, 538 (Tex. 2010) (reversing judgment; no probative evidence of causation); *Marathon*, 106 S.W.3d at 727-29.

In sum, there is simply no evidence of causation here. The judgment should therefore be reversed and a take nothing judgment should be rendered against LTT. *Hancock*, 400 S.W.3d at 71-72. At a minimum, the evidence of the required causal nexus is factually insufficient, requiring a new trial. *Pool*, 715 S.W.2d at 635.[7]

**B.      The jury's damage awards are not supported by legally or factually sufficient evidence**.

In response to separate damages questions, the jury awarded LTT (1) $7.9 million for loss in its fair market value and (2) $790,000 for loss in the fair market value of its confidential information. Neither award is supported by legally or factually sufficient evidence.

---

[7] LTT argued below that it proved damages caused by Appellants' breach of Section 3 of the Letter of Intent, the best efforts provision. 1SCR230, 236-37. That argument rests squarely on an unsubstantiated series of speculative assumptions, including (1) that if HUD had known about Lake Travis Specialty Hospital, it would not have issued the Commitment or completed the loan or (2) that if the Letter of Intent had terminated sooner, HUD would have been aware that Lake Travis Specialty Hospital was to be operated as a general acute care facility when it opened. *Id.* But there was no evidence at trial of whether HUD would have made a different decision if it had known Lake Travis Specialty Hospital was to operate (when it opened), as a general acute care facility, and there is no evidence that if the Letter of Intent had terminated earlier, construction of Lake Travis Specialty Hospital would have finished before the loan closed, as LTT also speculated. *Id.*; *Hancock*, 400 S.W.3d at 70-71; *Marathon*, 106 S.W.3d at 727-29.

**1.** **There is no legally or factually sufficient evidence of damages sustained by Berry and McDonald (parties to the Letter of Intent); LTT presented evidence only of its own alleged damages.**

An "assignee 'stands in the shoes' of the assignor but acquires no greater right than the assignor possessed," and "may assert only those rights that [the assignor] himself could assert." *Gulf Ins. Co. v. Burns Motors, Inc.*, 22 S.W.3d 417, 420 (Tex. 2000); *John H. Carney & Assocs. v. Tex. Prop. & Cas. Ins. Guar. Ass'n*, 354 S.W.3d 843, 850 (Tex. App.—Austin 2011, pet. denied) (citation omitted). It follows then that the assignee can "recover only those damages potentially available to its assignor." *Great Am. Ins. Co. v. Jim Stephenson Motor Co.*, No. 05-94-00858-CV, 1996 WL 135688, at *4 (Tex. App.—Dallas Mar. 26, 1996, writ denied); *Wheelways Ins. Co. v. Hodges*, 872 S.W.2d 776, 782 (Tex. App.—Texarkana 1994, no writ) (assignee could recover only for her assignor's mental anguish).

Although LTT was a party to the May 2009 Confidentiality Agreement with SDP (upon which LTT chose not to sue), LTT was **not** a party to the Letter of Intent and had no independent right of confidentiality arising therefrom. Before trial, Berry and McDonald's estate assigned their claims under the Letter of Intent to LTT. PX-421; RR8:163-64. Their transactional counsel explained that LTT was not made a party to the Letter of Intent because "the principals were in control

of the project and the principals, as it relates to the project, had information that was not necessarily LTT's." CE3:46m:44s–46m:56s.[8]

Accordingly, at trial, LTT could recover damages only for improper disclosures or use of **Berry's and McDonald's** confidential information. Disclosure or use of **LTT's** confidential information could give rise to neither liability nor damages. The only evidence presented during trial was related to how **LTT** was allegedly injured and the amount of **LTT's** alleged damages. For example, LTT argued that a breach caused LTT to lose the fair market value of its confidential information. *E.g.*, RR8:161-62 (LTT's counsel asking Berry if he had "an opinion about what [was] the loss in value of **LTT's** confidential information") (emphasis added); *see also* RR6:126, 162-63; RR8:104-06, 161-62; RR9:59-60. No witness testified that Berry or McDonald sustained any injury or damage resulting from the Sossi answers at issue. Indeed, this is the first place LTT's breach of contract claim comes off the tracks.

The questions to the jury further illustrate the point. First, LTT asked the jury to award damages for the loss in "value of **LTT's** confidential information." CR13006 (emphasis added).

---

[8] As Berry and McDonald were represented by counsel in drafting the Letter of Intent (*e.g.*, RR12:87-88, 175), their assignee, LTT, cannot now be heard to complain about terms not to its liking.

Second, LTT asked the jury to award damages for the loss in "fair market value *of LTT*." *Id.* (emphasis added). Again, the focus is on LTT, not Berry or McDonald. LTT presented evidence of its own alleged loss in value. LTT did not present evidence of the loss in value of the assignors' investment.

***Third***, LTT asked the jury to award damages for "***LTT's*** lost profits" that were a consequence of the alleged breach. CR13006 (emphasis added). Although the jury did not award lost profit damages,[9] those damages were also exclusive to LTT. *E.g.*, RR8:82, 103; RR13:26-27.

LTT cannot circumvent this lack of evidence by claiming that, because LTT suffered damages, LTT's owners implicitly suffered damages. To do so would ignore the legal separateness between LTT, a limited liability company (CR159; RR9:163), and its members. *See, e.g.*, *Barrera v. Cherer*, No. 04-13-00612-CV, 2014 WL 1713522, at *2 (Tex. App.—San Antonio Apr. 30, 2014, no pet.) (mem. op.) ("A limited liability company is considered a separate legal entity from its members."); *see also Wingate v. Hajdik*, 795 S.W.2d 717, 719 (Tex. 1990) ("A corporate stockholder cannot recover damages personally for a wrong done solely to the corporation, even though he may be injured by that wrong."). Similarly, "a member of a limited liability company does not have an interest in any specific

---

[9] The jury's refusal to award lost profit damages is yet another irreconcilable conflict with its award of $7.9 million in loss value. It begs the question of how a company with no potential lost profits can have a loss in value of $7.9 million, especially when both damages models were based upon the same projections. RR8:82-83, 89-90, 100-03; RR13:33-36; *see also infra* at n.11.

27

property of the company." *Barrera*, 2014 WL 1713522, at *2 (citing Tex. Bus. Orgs. Code § 101.106(b)). The assignment recognized the legal separateness.

In sum, the lack of evidence of injury and damages directly sustained by Berry and McDonald requires that the judgment be reversed and a take-nothing judgment be rendered in Appellants' favor. *Gulf Ins. Co.*, 22 S.W.3d at 420; *Wheelways Ins.*, 872 S.W.2d at 782.[10] At a minimum, factual insufficiency requires a new trial. *Cain*, 709 S.W.2d at 176.

### 2. The jury's $7.9 million award cannot stand.

Question 6(3) asked the jury to award LTT damages, if any, for "[t]he loss in fair market value of LTT that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent." CR13006. The jury awarded $7.9 million. *Id.*

The record, however, tells a different story. First, not a single witness testified and no document admitted into evidence references, mentions, or suggests that LTT's fair market value was $7.9 million. To the contrary, the only witness who testified as to the diminution in value of LTT (Berry) testified that the amount was $13.8 million. What's worse, the $7.9 million that the jury awarded was tied

---

[10] *See also M-I LLC v. Stelly*, 733 F. Supp. 2d 759, 705-96 (S.D. Tex. 2010) (addressing breach of a non-compete agreement brought by successor company who had been assigned rights under the agreement and holding that, consistent with Texas law, the plaintiff/assignee would be required to prove loss to the seller/assignor as a result of the defendant/employee's alleged breach); *Ins. Co. of State of Pa. v. Commercial Union Ins. Co.*, No. 05-95-00471-CV, 1996 WL 732470 (Tex. App.—Dallas Dec. 20, 1996, no writ).

to *other damage models*. Indeed, Berry identified that precise amount as the value of all of LTT's confidential information, which was the subject of a separate submission (Question 6(1)) and as the amount due to Berry and McDonald under Section 2 of the Letter of Intent (a theory disposed of by summary judgment). Second, Berry's testimony as to the $13.8 million in lost value in LTT was conclusory and non-probative and fails the reasonable certainty test. Third, there is no evidence, or factually insufficient evidence, that the loss in LTT's fair market value was a foreseeable consequence of breach of the Letter of Intent.

> ### a. The jury's lost value award has zero support in the record.

Texas law demands proof of a rational damages computation that links the evidence to the amount awarded by the jury. *Bentley v. Bunton*, 94 S.W.3d 561, 605 (Tex. 2002) (noting that a jury does not have "carte blanche to do whatever it will"); *Saenz v. Fid. & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (a jury may not "simply pick a number and put it in the blank[,]" but "must find an amount that . . . 'would fairly and reasonably compensate' for the loss"); *see also Salinas v. Rafati*, 948 S.W.2d 286, 289 (Tex. 1997) (a "jury must have an evidentiary basis for its findings"); *Texarkana Mem'l Hosp., Inc. v. Murdock*, 946 S.W.2d 836, 839-41 (Tex. 1997); *Canyon Vista Prop. Owners Ass'n v. Laubach*, No. 03-11-00404-CV, 2014 Tex. App. LEXIS 1099, at *14-22 (Tex. App.—Austin

Jan. 31, 2014, no pet.) (mem. op) (a rational basis for jury's calculation of damages must exist). This principle alone requires that the $7.9 million award be reversed.

LTT put its claim for its loss in fair market value in Berry's hands. Berry opined that the fair market value of LTT was $13.8 million. RR8:101-04. Berry *never* testified that the *loss* in LTT's fair market value was $7.9 million, any amount near that figure, or any amount other than $13.8 million. Nor is there any other evidence in the record to support the $7.9 million award for the loss in LTT's fair market value.

Berry testified that all of LTT's confidential information was worth $7.9 million—**which was the subject of a separate damages claim and separate award (for which $790,000 was awarded)**. RR8:104-06, 161-62; RR9:165; CR13006. And Berry and others testified that $7.9 million was the amount of money he and McDonald were to receive under Section 2 of the Letter of Intent if Lakeway Regional acquired the Lease. RR8:106; RR12:170-71; RR13:104-06. But no evidence links $7.9 million to "the loss in fair market value of LTT" and therefore no evidence supports the amount the jury wrote in the answer blank to Question 6(3).

Because the jury's $7.9 million award (1) does not correspond to any evidence for the loss in its fair market value, (2) corresponds to evidence of an entirely *different* damage model, and (3) reflects the amount that would have been

due as damages for breach of Section 2 (which claim was dismissed by summary judgment), it must be set aside. *Salinas*, 948 S.W.2d at 289.

Myriad other reasons also require vacating the $7.9 million award.

> **b.  Berry's opinion was conclusory, speculative, and lacking in reasonable certainty.**

A business owner's testimony on the value of the business—especially the valuation of a new business based on projected income—is not legally sufficient evidence of damages when the testimony is conclusory, speculative, and lacking reasonable certainty. This rule arises from several legal principles.

First, a business owner may testify as to the value of his business, but his testimony is subject to the same standards as expert testimony. *Natural Gas Pipeline Co. of Am. v. Justiss*, 397 S.W.3d 150, 155-59 (Tex. 2012) (discussing a business owner's valuation in the context of the Property Owner Rule). Such testimony cannot be conclusory or speculative. *Id.* at 155-56.

Second, courts are naturally skeptical of unverified and untested internal projections as being inherently speculative and lacking in reasonable certainty. For example, a business owner's conclusory or speculative testimony about future income will not support a judgment. *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992); *Springs Window Fashions Div., Inc. v. Blind Maker, Inc.*, 184 S.W.3d 840, 884, 888-89 (Tex. App.—Austin 2006, pet. granted, judgm't vacated w.r.m.).

Indeed, internal projections about a business's future income are frequently rejected as an evidentiary basis for an award. *See, e.g.*, *Univ. Gen. Hosp., LP v. Prexus Health Consultants, LLC*, 403 S.W.3d 547, 557-58 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (rejecting *pro forma* as a basis for awarding damages); *Ramco Oil & Gas Ltd. v. Anglo-Dutch (Tenge) L.L.C.*, 207 S.W.3d 801, 822-25 (Tex. App.—Houston [14th Dist.] 2006, pet. denied).[11] This concern for internal projections is heightened in new business and new enterprise cases. *E.g.*, *Tex. Instruments, Inc. v. Teletron Energy Mgm't, Inc.*, 877 S.W.2d 276, 278-81 (Tex. 1994) (profits "dependent on uncertain or changing market conditions, or on chancy business opportunities . . . or entry into unknown or unviable markets . . . cannot be recovered").

Third, and similarly, testimony concerning lost value damages requires ***reasonably certain*** evidence of how the market valued the lost asset or opportunity. *Phillips v. Carlton Energy Grp., LLC*, No. 12-0255, 2015 Tex. LEXIS 439, at *31 (Tex. May 8, 2015) (discussing the reasonable certainty requirement and noting that it could "think of no reason . . . why it would make sense to deny damages based on speculative evidence of lost profits but allow recovery of lost value based on the same evidence"); *see also id.* at *34-35.

---

[11] *University General* and *Ramco* cannot be fairly distinguished on the basis that they concern lost profits awards. Berry's projections served as the basis for both LTT's lost profits and lost value claims. RR8:89-90, 100-04; RR13:33-36.

Fourth, unexplained opinions or assumptions cannot support a judgment. *Justiss*, 397 S.W.3d at 156; *Springs*, 184 S.W.3d at 888-89 (unexplained assumptions render calculations "pure speculation"); *see also Earle v. Ratliff*, 998 S.W.2d 882, 890 (Tex. 1999) ("expert must explain the basis of his statements to link his conclusions to the facts").

Berry's testimony violates these principles.

***Overview.*** To determine the loss in LTT's fair market value, Berry claimed to use a three-step "net income methodology." First, he multiplied LTT's year one ***projected*** Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") by three, which he claimed came to $13.8 million. RR8:101-02. LTT's year one EBITDA was necessarily projected because LTT never generated a dollar in revenue. RR9:162-63. That projected EBITDA came from a 48-month *pro forma* Berry initially prepared in 2004 and 2005 to lure potential investors to finance LTT's intended business activities (by showing the project's "potential" success), as later updated by Berry and then modified by Glass, LTT's lost profits expert. PX-416; RR8:82-99; RR13:34-42, 45, 67, 237-38.[12]

---

[12] Glass's modifications included carrying the projections out to 60 months, adding in overlooked expenses (*e.g.*, housekeeping), increasing the insurance expense, correcting mathematical mistakes, and increasing expenses to account for inflation. RR13:34-42, 67, 91-95; PX-416 at 13. At trial, Glass added another modification, agreeing with Appellants' expert that Berry's projections understated expenses. RR14:15-16.

33

Second, Berry looked to see if any value remained in the company. He identified "some equipment" and, based on conversations that LTT's facility manager had with other facility managers, Berry concluded that the equipment was worth about 60% of its historical cost. RR8:103.[13] He then "took the $13.8 million and deducted the remaining value of the equipment to come up with a net loss." *Id.*

Third, Berry told the jury that LTT was "virtually worthless" as a result of Lakeway Regional's and SDP's alleged breaches. *Id.* Thus, the difference between LTT's value before and after the breach, according to Berry, was $13.8 million. *Id.*

***Berry's failure to explain key pieces of his pro forma shows his opinion is unsupported.*** Year one of Berry's *pro forma* was the anchor for his opinion of LTT's pre-breach value, and while Berry provided a high-level review of part of its contents, several key components were never explained. For example, Berry testified that in-patient revenues were derivative of four categories: Medicare, Medicaid, commercial, and self-pay. RR8:90, 93. Berry claimed to have used a "large statistical sampling" to "determine the type of number and the kinds of admissions" (RR8:85), but never explained who was sampled or how that exercise informed his *pro forma* (patient days attributable to each revenue category). Berry

---

[13] Berry never assigned a dollar value to the hospital equipment.

also stated that there was a "hospital specific Medicare rate" appearing in this *pro forma*, only to then unhelpfully tell the jury that "there's a bunch of factors that go into that, that I won't bore you with." RR8:95. This rate was one of just three factors (admissions *x* rate *x* multiplier assigned by Medicare) underlying all of the revenue projections, yet Berry never said what the actual rate was or, more importantly, how it was derived. RR8:95-96.

Nor did Berry explain how he determined the vast majority of his projected expenses. For instance, his *pro forma* includes in excess of 150 expense lines. PX-416.[14] Berry mentioned in passing that expenses for staffing, medical supplies, pharmaceuticals, and specialized equipment was connected to reimbursement rates (RR8:88), without providing any explanation as to why those particular expense projections were reasonable and without identifying the objective data he used. And for several line items (*e.g.*, legal and accounting), Berry allocated $0 (PX-416 at 5), with no explanation as to why $0 would be reasonable. *Phillips*, 2015 Tex. LEXIS 439, at *34-36 (holding that the evidence provided no basis for determining the reliability of expert's volume predictions or explanation for why the expert's projection was reasonable or supported the risk analysis); *City of San Antonio v.*

---

[14] The printed version of the Excel spreadsheet (PX-416, pages 1-12) is somewhat difficult to follow. It is suggested that the Court follow the Year 1 Summary column that begins on page 1 and continues on pages 5 and 9.

*Pollock*, 284 S.W.3d 809, 816 (Tex. 2009) (baseless opinions cannot support a judgment).

***Berry also failed to explain why relying on a factually incorrect pro forma led to a reasonably certain value.*** Berry also never explained how his *pro forma*, which had not been updated to account for materially changed facts, remained a reliable basis for his valuation opinion. Two examples illustrate the point. First, a primary driver of LTT's income was the bed count (patients admitted). RR8:87-93, 95-98; RR13:78-79. As built, Lake Travis Specialty Hospital had ***46 beds***. RR9:40; CR163. However, the used-at-trial *pro forma* assumed ***38 beds***. PX-416. Second, the *pro forma* assumed that Lake Travis would have ***two*** operating rooms; it was not updated to reflect that LTT ended up with ***four*** operating rooms. RR9:187-88; RR13:44, 67, 96-99; PX-25; PX-416; PX-477 at COL00000354; DX-105. The as-built hospital thus would have had materially different expenses and revenues than those contained in Berry's projections.[15] Berry never explained why it was reasonable to base his fair market value opinion on such basic, erroneous facts. *Justiss*, 397 S.W.3d at 159-62; *City of Keller*, 168 S.W.3d at 813 ("if an expert's opinion is based on certain assumptions about the facts, we cannot disregard evidence showing those assumptions were unfounded"); *see also Phillips*, 2015 Tex. LEXIS 439, at \*36 (rejecting as some evidence a damages

---

[15] For example, Berry's *pro forma* assumed "facility operating expenses" for a 38-bed, not a 46-bed, hospital. PX-416.

model based on projections that were "demonstrably unrealistic"); *Ramco*, 207 S.W.3d at 822-23 (criticizing expert for failing to "quantify the risk of failure" and holding that expert's characterization of calculations as reasonably certain or conservative did not satisfy the reasonable certainty test).

***Berry failed to explain his assumed "extraordinarily high" occupancy rate.*** Berry's *pro forma* assumed an occupancy rate of 81.6% (average of 31 patients/day after the first six-month ramp-up period), which if it had been achieved, would have catapulted LTT to the top 5% of hospital occupancy rates in Texas. PX-416 at 1; RR13:78-81, 196. Berry never explained why his projected 81.6% occupancy rate was reasonable or a supportable risk analysis. *See Phillips*, 2015 LEXIS 439, at *34-45 (rejecting presumed demand and recovery rate for oil and gas reserves). LTT's lost profits expert, Glass, acknowledged that Lake Travis Specialty Hospital could have also been in the bottom 5% and that Berry had earlier testified that the demand in Lakeway (in 2010 when LTT expected to open its hospital) was not for 38 beds (as used in the *pro forma*) but was 22 beds. RR13:80-85. Glass's only explanation for the assumed "***extraordinary[] success***" was that, after all, "somebody's got to be in the top 5 percent." RR13:80-81 (emphasis added). Berry's testimony that the market could support only 22 beds per day renders his forecasted 81.6% occupancy rate more than speculative (and

37

spectacularly optimistic)—it was flat wrong or at least "demonstrably unrealistic." *Phillips*, at *36.

**Berry failed to account for inconsistencies in his testimony.** Berry never reconciled his testimony that LTT was "virtually worthless" yet owned valuable hospital equipment worth 60% of its historical cost. RR8:103. *Wal-Mart Stores, Inc. v. Merrell*, 313 S.W.3d 837, 839 (Tex. 2010) (per curiam) (failing to account for inconsistencies nullifies probative value of expert testimony); *City of Keller*, at 813, n.34.

**Berry's testimony regarding use of a three-year multiplier was conclusory.** As noted above, Berry determined LTT's pre-breach value by multiplying year one projected EBITDA by three. RR8:101-02. Absent from Berry's testimony is any explanation of why three was the proper multiplier for a general acute care hospital that never opened. Berry identified no comparable general acute care facility that, before it opened, sold for three times its first-year projected EBITDA. *See* RR13:72. Instead, Berry apparently took the lower end of the multipliers that he claimed had been used to determine value for unidentified hospitals that had been in existence for some unidentified time period without explaining (1) whether the facilities he referred to were long-term acute care facilities or general acute care facilities, and (2) the competitive environment in which they operated. His testimony is therefore non-probative. *Justiss*, 397 S.W.3d at 159-62.

### c.     The range cases do not apply.

During the post-verdict phase, LTT argued that the jury was at liberty to pick any amount of damages—provided that the figure was somewhere between $13.8 million (the amount Berry claimed a willing buyer would have paid for LTT before breach) and whatever number just above $0 Berry meant by his testimony that LTT was "virtually worthless" (the amount Berry claimed LTT was worth after breach).  1SCR252, 256-58.  Numerous courts have rejected the argument that a jury may assign a number provided it is lower than the amount presented.  *E.g.*, *Holland v. Lovelace*, 352 S.W.3d 777, 793-95 (Tex. App.—Dallas 2011, pet. denied) (discussing range cases and rejecting argument that a "jury may assign any number as damages provided that number is less than the high end testified to by the experts"); *Ramco*, 207 S.W.3d at 823 (rejecting plaintiff's argument that by reducing the damages sought by 99%, from $640 million to $64 million, the jury "wrung out of the verdict any speculation").

Additionally, recall that Berry offered the jury *one* calculation: 3 *x* year-one EBITDA = $13.8 million.  RR8:101-04.  LTT neither provided the jury with a range of damages nor any means by which it could rationally select an amount between $13.8 million and whatever unspecified, numerical amount Berry attributed to his "virtually worthless" assessment of the company.  *Holland*, 352 S.W.3d at 792-95.  This is not a case, for example, where Berry testified that he

thought (1) LTT's pre-breach value was between two specific numbers (and offered a factually supported basis for both numbers), and (2) LTT's post-breach value was $0. Only perhaps in that situation would the "range argument" be colorable. But here, Berry offered only one pre-breach value ($13.8 million) and one post-breach value ("virtually worthless"). To be more specific, Berry did not offer testimony that the pre-breach value of LTT was between the range of $7.9 million and $13.8 million, or any other range. As the *Holland* line of cases teach, LTT cannot now save an arbitrary damages award merely by showing that it is less than what was requested. This rule is particularly important where, as here, the jury did not base its $7.9 million award on any evidence related to a range of damages for the value of the company but, instead, appears to have based its award on evidence tied to ***other damages models***, one of which was disposed of by summary judgment.

> **d. Any finding that the jury's award of $7.9 million was foreseeable is not supported by legally or factually sufficient evidence.**

The jury's damage award for LTT's loss in fair market value also fails because the record lacks any evidence that these damages were foreseeable. There is no evidence that this measure of damage was even ***contemplated*** by the parties when they signed the Letter of Intent. At the very least, the evidence is factually insufficient to support foreseeability.

Consequential damages—like those awarded to LTT—are recoverable only if they were foreseeable at the time the contract was made. *Basic Capital Mgmt., Inc. v. Dynex Commercial, Inc.*, 348 S.W.3d 894, 901-02 (Tex. 2011). Stated differently, consequential damages "are ***not recoverable*** unless the parties contemplated ***at the time they made the contract*** that such damages would be a ***probable*** result of the breach." *Stuart v. Bayless*, 964 S.W.2d 920, 921 (Tex. 1998) (per curiam) (emphasis added). In addition, the damages must be "***directly traceable*** to the wrongful act and result from it." *Id.* (emphasis added).

Importantly, general knowledge of a plaintiff's business is not sufficient to satisfy the element of foreseeability. *Id.* at 902. LTT was required to present more. Specifically, LTT was required to present evidence that the parties contemplated a loss in LTT's fair market value if the Letter of Intent were breached. *See Spin Doctor Golf, Inc. v. Paymentech, L.P.*, No. 05-11-01014-CV, 2013 WL 3355199, at *5 (Tex. App.—Dallas July 2, 2013, pet. denied) (mem. op.) ("[Plaintiff] presented no [summary judgment] evidence that the expenses were contemplated by the parties at the time of the alleged contract to be a probable result of a breach."); *see also JAAV Invs., LLC v. Amcap Mortg., Ltd.*, No. 14-12-00839-CV, 2014 WL 708492, at *6 (Tex. App.—Houston [14th Dist.] Feb. 20, 2014, no pet.) (concluding, in a fraud case, that "at trial, no party adduced evidence describing the foreseeability of damages" and holding that there was "not more

than a scintilla of probative evidence of foreseeability to support the measure of consequential damages submitted to the jury"). Here, the record does not establish that loss of LTT's fair market value was a foreseeable damage for breach of the Letter of Intent.

As an initial matter, nothing in the Letter of Intent implicates LTT's fair market value. At Berry's and McDonald's request, LTT was not a party to the Letter of Intent, and LTT was to be paid nothing under the Letter of Intent. PX-2; PX-64; PX-69. Therefore, it was not foreseeable that a breach of the Letter of Intent would result in diminution to the fair market value of non-party LTT.

Furthermore, it was not foreseeable that a breach of the Letter of Intent would render LTT "virtually worthless." The Letter of Intent outlined a single transaction for acquisition of a single asset owned by LTT—the Lease. The Lease was not even LTT's "primary asset." RR8:106. The Letter of Intent also made clear that the proposed consideration of $7.9 million for the assignment of the Lease was payable to Berry and McDonald and reflected a return of expenses incurred by them in the development of the Lease property plus a $1.5 million premium. PX-2 § 2.

The Letter of Intent also contained terms controlling the exchange and use of information for due diligence. *Id.* §§ 6, 9. None of the terms surrounding the use or confidentiality of the parties' information mention or refer to LTT's fair market

value.  Section 10.1 specifically authorizes injunctive relief without a showing of actual harm.  PX-2 ("Based upon the subject matter of this Letter of Intent . . . material and irreparable harm shall be presumed.").  Even though not applicable to LTT as a non-party, Section 10.1's inclusion demonstrates that the parties did not know the types of injury/damage the non-breaching party may sustain.  *Stuart*, 964 S.W.2d at 921-22 (noting that contract "makes no mention of this possibility [of the type of injury] and certainly contains no agreement to pay damages for [the type of injury at issue]").

Of course, the foreseeability inquiry is not confined to the Letter of Intent.  LTT could have elicited evidence of foreseeability through Berry, Alexander, or the parties' lawyers, all of whom testified at trial.  RR1:11-23.  Yet LTT did not elicit any evidence (testimony or documentary) that LTT's alleged loss in fair market value was "foreseeable and directly traceable" to the Sossi answers at issue in the May 10 email and resulted from them.  *Stuart*, 964 S.W.2d at 921.

In sum, at a minimum, LTT was required to present evidence that Appellants understood that a breach of the Letter of Intent would negatively impact LTT's fair market value.  LTT did not meet that threshold.  There is no evidence whether any party contemplated that loss in fair market value of LTT was a potential result of a breach, let alone a "probable result" as required by the Texas Supreme Court.  *Id*.  The award of $7.9 million in lost fair market value must therefore be reversed.

### e. LTT has no valid argument to support the $7.9 million award.

In addition to the inapposite range cases LTT attempted to rely on below after the verdict (*see* above), LTT offered other arguments aimed at salvaging the $7.9 million award, which if reasserted, have no merit.

For example, LTT erroneously argued that the testimony that Lakeway Regional would have had to pay Berry and McDonald between $7.5 million and $8.5 million under Section 2 of the Letter of Intent had the deal closed supported the jury's answer to Question 6(3). 1SCR252-54. *First*, allowing LTT to recover the amount Berry and McDonald would have received under Section 2 if the transaction had closed conflicts with Judge Yelenosky's summary judgment order on LTT's Section 2 claim. CR12266; *see also Haase v. Glazner*, 62 S.W.3d 795, 800 (Tex. 2001) (holding that a party cannot recover benefit of the bargain damages related to an unenforceable contract). *Second*, Question 6(3) did not inquire about the amount that Berry and McDonald would have been paid if Lakeway Regional had acquired the Lease; rather, that was the damage model LTT proposed before trial for its defunct claim for breach of Section 2 (i.e., payment of the promised consideration had Lakeway Regional acquired the Lease). CR171-72, 13006, 13206; *Osterberg v. Peca*, 12 S.W.3d 31, 55-56 (Tex. 2000) (sufficiency of the evidence is measured under the charge); *Peterson v. Kroschel*, No. 01-13-00554-CV, 2015 Tex. App. LEXIS 5543, at *11-14 (Tex. App.—

Houston [1st Dist.] June 2, 2015, no pet.) (mem. op.); *Springs*, 184 S.W.3d at 883 n.41. ***Third***, the Letter of Intent is no evidence of what a willing buyer would have paid for the Lease (even if that had been the measure submitted in Question 6(3)), because the evidence is undisputed that Lakeway Regional decided not to go forward with the transaction. *Accord Phillips*, at *38-40 (holding that a binding contract for the purchase of plaintiff's interest was some evidence of value). ***Fourth***, Berry used an income methodology. RR8:101. LTT cannot support the jury's award based on an entirely different methodology—*e.g.*, the supposed value of the Lease as set forth in an unenforceable provision of the Letter of Intent. *Springs*, 184 S.W.3d at 884-86 nn.42-43; *see also Holt Atherton*, 835 S.W.2d at 85 ("once a party has chosen a particular method for measuring their lost profits, they must provide a complete calculation").

LTT also argued that the parties' lost profits experts' testimony provided "additional evidence of assets, revenues, expenses, opening dates and other metrics that the jury could have relied on to reduce Mr. Berry's $13.8 million to $7.9 million." 1SCR255. That argument erroneously presumes that LTT can mix and match evidence probative of a different damages measure (*e.g.*, lost profits), ***which the jury rejected*** (CR13006), to supply an evidentiary basis for the jury's $7.9 million award. *Springs*, 184 S.W.3d at 884, 886 n.43. Moreover, because the jury was explicitly instructed to consider LTT's damage claims separately (CR13006),

LTT's attempt to salvage the jury's award for lost value with evidence offered on a separate measure cannot be credited. *Osterberg*, at 55-56; *see also Daugherty v. So. Pac. Transp. Co*., 772 S.W.2d 81, 83 (Tex. 1989) (juries are presumed to have followed court's instructions); *Springs*, 184 S.W.3d at 886 n.43.

LTT similarly claimed that the jury might have found that LTT's goodwill was a valuable asset and reduced the loss in fair market value accordingly. 1SCR255. But while Berry mentioned that goodwill was a valuable asset of LTT's (RR8:106), he assigned it no value, foreclosing any argument that the jury's award can be upheld on that basis. *Salinas*, 948 S.W.2d at 289; *Canyon Vista*, 2014 Tex. App. LEXIS 1099, at *14-15; *Examination Mgmt. Servs., Inc. v. Kersh Risk Mgmt., Inc.*, 367 S.W.3d 835, 844 (Tex. App.—Dallas 2012, no pet.). In other words, the jury's award cannot be upheld by assuming that the jury guessed at the value of LTT's goodwill and then deducted that amount from the $13.8 million loss in value Berry claimed LTT sustained. The same is true of the equipment that Berry testified LTT owned but to which he did not ascribe a specific value. There is simply no evidence from which the jury could have performed some mathematical equation in the jury room to reduce LTT's damage model ($13.8 million) to the amount awarded ($7.9 million) because LTT did not put on any evidence of the variables that would be involved in that equation. *Univ. Gen. Hosp., LP*, 403 S.W.3d at 555. The far more likely explanation for why the jury departed from

LTT's $13.8 million figure and awarded $7.9 million for the diminution in value is that it either awarded LTT the amount it would have received under Section 2 of the Letter of Intent (i.e., $7.9 million) had the deal closed or errantly understood that blank to relate to the claimed value of the confidential information at issue (i.e., $7.9 million).

### 3. The jury's award of $790,000 is also unsupported by legally or factually sufficient evidence.

The jury's $790,000 award for the loss in fair market value of LTT's confidential information suffers from many of the same problems as the jury's $7.9 million award for the loss in the fair market value of LTT.

Once again, Berry's testimony falls short. First, Berry testified that the value of LTT's confidential information was $7.9 million, not $790,000. RR8:104-06, 161-62; RR9:165. According to Berry, the $7.9 million was a combination of historical costs incurred between 2004 and the date of the breach (cash outlays and borrowed sums) plus the amount a willing buyer would pay a willing seller. RR8:104-06, 161-62. Berry testified that following Lakeway Regional's breach, the confidential information was "[v]irtually worthless." RR8:162. That is the entirety of the evidence on this claim. As with the jury's award for loss in fair market value of LTT, the jury's award for loss in fair market value of LTT's confidential information does not match any evidence but is an arbitrary amount plucked from thin air. *Saenz*, 925 S.W.2d at 614.

Second, Berry's brief testimony on the fair market value of LTT's confidential information was conclusory, speculative, vague, non-probative, and lacking reasonable certainty. *Phillips*, 2015 Tex. LEXIS 439, at \*32; *Justiss*, 397 S.W.3d at 158. And given Berry's testimony that the two primary assets of LTT were its confidential information and its goodwill (RR8:106), it makes even less sense that a reasonable and fair minded jury could have found that breach of the Letter of Intent diminished LTT's value by $13.8 million, but that the loss in value of one of LTT's two primary assets was $790,000. *City of Keller*, 168 S.W.3d at 827.

Below, LTT tried to salvage the jury's $790,000 award with many of the same arguments used in its attempt to salvage the jury's $7.9 million award. 1SCR256-58. Those efforts are futile for all the reasons stated above.

As an additional argument, LTT argued that the jury might have determined that interest savings achieved by Lakeway Regional by participating in the HUD program evidenced the value of the confidential information to Lakeway Regional and SDP. 1SCR242, 257. However, that was not the methodology LTT presented to the jury. RR8:104-06, 161-62. LTT cannot now defend an arbitrary award by mining the record for dollars and adding them together. *Holt Atherton*, 835 S.W.2d at 85; *Springs*, 184 S.W.3d at 884, 885-86 nn.42-43. Moreover, LTT

represented it was not seeking damages based on Lakeway Regional's purported interest savings. RR5:41-43.

In sum, because neither damage award is supported by legally sufficient evidence, reversal and rendition of a judgment that LTT take nothing is the appropriate remedy. *Kerr-McGee Corp. v. Helton*, 133 S.W.3d 245, 254, 259-60 (Tex. 2004) (declining to remand and provide plaintiff "'an opportunity for another bite at the apple'"). Alternatively, because the evidence is factually insufficient to support either damage award and both awards are excessive, the Court should remand for a new trial. *Pool*, at 635; *DeNucci v. Matthews*, 03-11-00680-cv, 2015 Tex. App. LEXIS 4041, *27-33 (Tex. App.—Austin Apr. 23, 2015, no pet.).

## II. The Trial Court Committed Fatal Charge Error; a New Trial Is Warranted.

### A. Under *Casteel*, and the facts of this case, the trial court was required to list the specific provisions of the Letter of Intent that could support the jury's "yes" finding to Questions 1(a) and 1(b).

Appellants objected to Question 1 on the basis of *Casteel* and submitted an instruction (a separate point below) that would accompany the question of whether Appellants failed to comply with specifically listed sections of the Letter of Intent because LTT's live pleading broadly alleged that Lakeway Regional and SDP breached the contract. CR171-72. But Section 2 was ***not*** viable at the time this case went to the jury; the trial court had granted summary judgment in favor of Lakeway Regional and SDP on LTT's Section 2 claim. CR12266.

49

Over Appellants' objections, the trial court erred in submitting Question 1 to the jury as a single, broad form question on liability that included consideration of Section 2—asking: "Did SDP and/or LRMC fail to comply with the Letter of Intent?" CR13000; RR14:30.[16]

"[W]hen a trial court submits a single broad-form liability question incorporating multiple theories of liability, the error is harmful and a new trial is required when the appellate court cannot determine whether the jury based its verdict on an improperly submitted invalid theory." *Casteel*, 22 S.W.3d at 388. "[W]hen a jury bases a finding of liability on a single broad-form question that commingles invalid theories of liability with valid theories, the appellate court is often unable to determine the effect of this error." *Id.* "It is essential that the ***theories submitted be authorized and supported by the law governing the case.*** If they are not, the appellate court must, at a minimum, be able to determine whether properly submitted theories constituted the basis of the jury's verdict." *Id.* at 389 (emphasis added).

A trial court errs when it submits theories of liability that are not legally

---

[16] The objection was as follows:

> [W]e object to Question No. 1 on the grounds that we believe it submits legally invalid theories of liability. In particular, the broad form fails to recognize that Judge Yelenosky previously granted summary judgment on the Section 2 claim, and the Section 2 claim can be considered by the jury under this broad form submission.

RR14:30.

viable, *e.g.*, liability theories that (a) have not been pleaded, (b) are not supported by legally sufficient evidence, or (c) are not supported by operative law. *See* Tex. R. Civ. P. 277 (requiring that the trial court submit issues that are raised by the pleadings and the evidence); *Casteel*, 22 S.W.3d at 390 (stating that Rule 277 implicitly mandates that the jury be able to base its verdict on legally valid questions and instructions); *see also Romero v. KPH Consol., Inc*., 166 S.W.3d 212, 215 (Tex. 2005) ("[B]road-form submission cannot be used to put before the jury *issues that have no basis in the law or the evidence*.") (emphasis added); Tex. R. Civ. P. 278.

While not every breach of contract case will require a separate inquiry into the terms breached, here it was required. Because broad form was used, it is impossible to know from the jury's answer to Question 1 whether the jury answered "yes" on the basis that Lakeway Regional failed to acquire the Lease or reimburse Berry and McDonald certain expenses, which are obligations only under Section 2 of the Letter of Intent, or on the basis of some other provision of the Letter of Intent.

In its post-verdict briefing, LTT—when arguing that the jury could consider breach of *any* provision of the Letter of Intent (except Section 2) (1SCR279)— highlighted the fundamental problem with submitting a broad form liability question when one aspect of the contract has already been held unenforceable: this

Court will never know if the jury's affirmative finding to Question 1 was based on a finding that Lakeway Regional or SDP breached Section 2 or some other aspect of the contract.

This case is much like *Texas Commission on Human Rights v. Morrison*, 381 S.W.3d 533, 536-38 (Tex. 2012) (per curiam), involving a former employee's retaliation action. In that case, the jury was asked:

> Did the Texas Commission on Human Rights (TCHR) take adverse personnel actions against Marilou Morrison because of her opposition to an unlawful discriminatory practice?

*Id.* at 535. Like Question 1 here—which fails to identify the provisions of the Letter of Intent that could be the basis of a breach finding—the charge in that case did not define "adverse personnel actions." *Id.* There, TCHR argued that the charge lumped its alleged wrongful actions together, that the case was "'really, about retaliation and termination'" and "***that it would not be possible to determine what adverse acts would form the basis of the jury's verdict.***" *Id.* at 536 (emphasis added). The Texas Supreme Court held that it was reversible error to ask in a broad-form question whether the employer took "adverse personnel actions" against the employee because the charge failed to define that phrase and it was impossible to determine what adverse "acts" formed the basis of the jury's verdict:

> This is the problem we identified in *Casteel*—commingling valid and invalid theories of liability in a broad-form question. This is

especially true given that, from the outset of the underlying proceeding, ***the scope of what adverse personnel actions could form the basis of the suit was a contentious issue.***

*Id.* (emphasis added). On the issue of harm, the Supreme Court held that "when a broad-form question allows a finding of liability based on an invalid theory, an appealing party does not have to prove that the jury actually relied on the invalid theory." *Id.* at 537.

Two other cases are illustrative and support a reversal: *Clear Lake City Water Authority v. Kirby Lake Development, Ltd.*, 123 S.W.3d 735 (Tex. App.—Houston [14th Dist.] 2003, pet. denied), and *McFarland v. Boisseau*, 365 S.W.3d 449 (Tex. App.—Houston [1st Dist.] 2011, no pet.).

In *Clear Lake*, the Water Authority argued that there was *Casteel* error in the broad-form submission of the breach of contract liability question involving several contracts because it could not be determined whether the jury relied on an invalid theory to find a breach. 123 S.W.3d at 752. The Fourteenth Court of Appeals held that two of the three breach of contract theories were invalid and should not have been considered by the jury as a basis for breach of contract:

> Because we cannot determine from the jury's answers the basis for their finding that the Authority failed to comply with its contracts, we find that the error is harmful, and we reverse and remand University's claims for trial.

*Id.*

53883200                          53

Likewise, in *McFarland*, the First Court of Appeals held it was reversible error to submit a single broad-form ***damages*** question that did not separately list each allegedly defamatory statement. 365 S.W.3d at 453-54; *see also Benge v. Williams*, No. 01-12-00578-CV, 2014 Tex. App. LEXIS 12445, at *45 (Tex. App.—Houston [1st Dist.] Nov. 18, 2014, no pet.) (rejecting argument that *Casteel* error did not apply in analogous context); *Sand Point Ranch, Ltd. v. Smith,* 363 S.W.3d 268, 274-75 (Tex. App.—Corpus Christi 2012, no pet.) (finding reversible error in submitting a broad-form question to the jury that included invalid bases for liability).[17]

Under these well-established principles, Question 1 was fatally flawed because it comingled valid and invalid liability theories. Further, without a proper instruction describing the provisions of the Letter of Intent on which the jury could find a breach (*see* Section II.C. below), this Court is unable to ascertain whether the jury based its answer upon a finding that either Appellant breached Section 2—though that result seems most probable given that the damages awarded for the

---

[17] Undoubtedly, the issue of whether Appellants complied with Section 2 was before the jury. Witnesses were asked questions about Section 2 directly and indirectly and, of course, the provision was part of the evidence presented to the jury. *E.g.*, RR6:90-91, 147-48; RR8:106, 168; RR9:141-42, 179, 210; RR12:17-19, 23; RR13:103-05; PX-2. *See Benge*, 2014 Tex. App. LEXIS 12445, at *30 ("If one of the plaintiff's legal theories does not support liability as a matter of law and the plaintiff presented evidence to the jury on that theory that may have led the jury to answer affirmatively the broad-form liability question incorporating the invalid theory, there is a *Casteel*-type charge error."). Importantly, the jury was never informed that a breach finding could not be based on either Appellant's failure to comply with Section 2. *See infra* at Section II.C.

breach matched the amount that would have been due under Section 2 had the transaction been consummated. CR13006; RR13:104-06. Because it is impossible to determine whether the jury's answer to Question 1 was based on Section 2 (an unenforceable provision) or some other provision, harm is presumed. Tex. R. App. P. 44.1(a)(2).[18]

## B. *Casteel* also applies to Question 6 regarding damages.

*Casteel* applies to damages submissions as well. *Harris Cnty. v. Smith*, 96 S.W.3d 230, 233-34 (Tex. 2002). Over Appellants' objection, the trial court allowed the jury to award damages predicated on a legally unenforceable section of the Letter of Intent.[19]

Because LTT alleged multiple breaches, the failure to provide the jury with a question that asked it to award damages connected to a specific breach also

---

[18] Alternatively, if the presumed harm *Casteel* analysis is found inapplicable, harm exists. The manner in which the breach claim was submitted allowed the jury to award damages that were recoverable under Section 2, which it appears the jury did (i.e., the $7.9 million is the same amount owed had Lakeway Regional acquired the Lease). RR8:106; RR9:210; RR12:170-71; RR13:104-06. Therefore, considering the entire record, the use of broad form submission probably resulted in an improper judgment. Tex. R. App. P. 44.1(a); *Hawley*, 284 S.W.3d at 856.

[19] Lakeway Regional and SDP objected to Question No. 6 as follows:

> We also object to Question No. 6 in that we believe that it also submits damage theories that are -- have been rejected by the prior -- prior Court's ruling in the summary judgments in the form of damages that may arise out of the contract itself. And the -- by this question, the jury will be answering the question and the Court of Appeals will not be able to tell the basis upon which the jury has rendered its decision.

RR14:35.

violates *Casteel. Id*. For example, in answering Question 6(3), which asked the jury to award damages for loss in fair market value of LTT because of "[Lakeway Regional] and/or SDP's failure to comply with the Letter of Intent," the jury could well have awarded LTT damages that resulted from the failure to comply with Section 2, even though LTT's claim for its breach and damages that were a "natural, probable, and foreseeable consequence" of that breach (CR13006) failed as a matter of law. CR12266.

Because of the broad-form question and predicate, this Court cannot determine whether a breach of Section 2 is what informed the jury's award. But (if harm were not presumed) it is probable given that the evidence presented at trial showed that had Lakeway Regional acquired the Lease, Section 2 required Lakeway Regional to pay Berry and McDonald approximately $7.9 million (comprised of reimbursements for incurred costs plus a $1.5 million lump sum). RR8:106; RR9:210; RR12:170-71; RR13:104-06; PX-2. That figure is, as noted above, the exact amount that the jury awarded. CR130056. *Romero*, 166 S.W.3d at 226 (even if the jury could have reached the same result with a proper instruction, "the error in the question is nevertheless reversible because it effectively prevents [the appellant] from complaining on appeal that they *would not* have done so").

**C.    The trial court likewise erred in refusing to include a proper instruction in Question 1—to cure the *Casteel* problem.**

Separate from, but consistent with, their *Casteel* objection, Appellants asked the trial court to instruct the jury that in deciding whether there was a failure to comply with the Letter of Intent, as to each specifically-listed section of the Letter of Intent, the jury had to find a valid, enforceable agreement between the parties, that the defendant breached the contract, and that the defendant caused the plaintiff injury. CR12972;[20] RR14:31. Had this instruction been given, then the jury would have been limited to the sections of the Letter of Intent that were legally enforceable, and would not have had the option to find in LTT's favor based on breach of unenforceable Section 2. And because the damages awarded by the jury ($7.9 million) is the same amount that would have been due upon acquisition of the Lease (*e.g.*, RR13:104-06), the harm resulting from the failure to provide this instruction is plain. Tex. R. App. P. 44.1(a).

The Texas Supreme Court made clear in *Hawley* that trial courts must give instructions to the jury to limit the jury's consideration to the act or omission that can create liability. *Hawley*, 284 S.W.3d at 863. The trial court did not do so here.

---

[20] The proposed instruction would have informed the jury that it had to find, as to specifically listed sections of the Letter of Intent, that there was a valid, enforceable contract, LTT was a proper party to the contract, LTT performed or was excused from performing, the defendant breached, and that breach caused LTT injury. CR12972.

Charge error infected the trial of the case. If the Court does not reverse and render on the grounds set forth in Section I, *supra*, a new trial is required.

## III. For Additional and Separate Reasons, the Judgment Against SDP Should Be Reversed.

LTT was not entitled to a judgment against SDP for at least three reasons: (1) as a matter of law, SDP cannot be liable for breach because it was not a party to the Letter of Intent and therefore had no obligations thereunder; (2) alternatively, whether SDP was a party to the Letter of Intent should have been submitted to the jury; and (3) there is legally and factually insufficient evidence that SDP breached the Letter of Intent.

### A. SDP was not a party to the Letter of Intent, but an agent of a disclosed principal.

"Unless the parties have agreed otherwise, a person making or purporting to make a contract with another ***as agent for a disclosed principal*** does not become a party to the contract." *A to Z Rental Ctr. v. Burris*, 714 S.W.2d 433, 435 (Tex. App.—Austin 1986, writ ref'd n.r.e.) (emphasis added). Here, SDP executed the Letter of Intent as the agent of its disclosed principal, Lakeway Regional. Indeed, the first paragraph identifies SDP as the agent for Lakeway Regional:

> Surgical Development Partners, LLC ("SDP") is pleased to submit this Letter of Intent, ***as agent for LRMC***, to each of you (collectively, the "Principals") (each a "Party" and collectively the "Parties") for the Parties to work in good faith . . . .

PX-2 (emphasis added). Because the only reasonable construction of the Letter of Intent is that SDP was not a party and was only acting as Lakeway Regional's agent, LTT's breach claim against it was not cognizable as a matter of law. *Fiess v. State Farm Lloyds*, 202 S.W.3d 744, 746 (Tex. 2006) (contract is not ambiguous if there is only one reasonable construction); *see, e.g.*, *Mays v. Pierce*, 203 S.W.3d 564, 575 (Tex. App.—Houston [14th Dist.] 2006, pet. denied). SDP, as a matter of law, had no duty to LTT, breached no agreement with LTT, nor caused any damages to LTT. Accordingly, the jury's answer to Question 1(b) is immaterial and should have been disregarded. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). The judgment against SDP should be reversed and a judgment rendered in its favor for this reason alone.

### B. The trial court, at the very least, should have submitted a jury question asking whether SDP was a party to the Letter of Intent.

Where a contract is ambiguous, a jury is to decide its meaning. *Plains Exploration & Prod. Co. v. Torch Energy Advisors Inc.*, No. 13-0597, 2015 Tex. LEXIS 558, at *22 (Tex. June 12, 2015).

Assuming *arguendo* that the Letter of Intent is ambiguous, the judgment must be reversed because SDP was prevented from having a jury decide the disputed issue of whether it was a party to the Letter of Intent. Undoubtedly, the evidence conflicted on this issue. Alexander testified that he signed the Letter of Intent in his capacity as CEO of SDP **as the agent** of Lakeway Regional and that

SDP's confidentiality obligations were under the earlier confidentiality agreement. RR11:179-80, 190-93; RR12:10-14. Conversely, Berry testified that SDP was a party to the Letter of Intent. RR6:149; RR8:202; RR9:172-74.

In light of the conflicting evidence, SDP asked the Court to either submit a question asking "Was SDP a party to the Letter of Intent dated September 15, 2009 in its individual capacity?" (CR12971) or to include an instruction to the breach of contract question that would have informed the jury that it had to find that "there is a valid, enforceable contract between the parties" (CR12972). Its requests were overruled. CR12971-72; RR14:30-31. The trial court abused its discretion in refusing to allow the jury to decide this threshold issue of whether SDP was a party to the Letter of Intent. Tex. R. Civ. P. 278; *Elbaor v. Smith*, 845 S.W.2d 240, 243 (Tex. 1992); *see also* CR11799 (LTT's acknowledgement in responding to SDP's summary judgment motion that at "a minimum, there is a question of fact as to whether the parties intended SDP to be bound" to the Letter of Intent). The failure to submit the instruction or question probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a)(1); *Hawley*, 284 S.W.3d at 856.

**C.    The jury's finding in answer to Question 1(b) is not supported by legally or factually sufficient evidence because SDP did not breach any alleged duty that caused any damages**.

The only evidence of the capacity in which Sossi was acting when he sent the May 10 email (or any other communications to HUD about LTT) came from

HUD witness Robert Deen. Deen unequivocally testified that he understood that Sossi was acting *on behalf of Lakeway Regional* at the time he sent the May 10 email:

> Question No. 332: "On whose behalf did HUD understand that Frank Sossi sent the May 10, 2010 response contained in Defendants' Exhibit 1?"
>
> Answer: "Mr. Sossi was responding for Lakeway Regional Medical Center."

RR10:20.

The record contains no evidence that contradicts Deen's testimony, nor does it contain any evidence that Sossi sent the May 10 email (or any other communication) on behalf of SDP. Because there is no evidence that Sossi was acting for SDP when he communicated with HUD about LTT, and no other evidence to support a finding of duty, breach, or causation as to SDP, the judgment against SDP should be reversed. *Ridgway*, 135 S.W.3d at 601. At a minimum, the evidence is factually insufficient to support the jury's finding that SDP breached the Letter of Intent, warranting a new trial. *Cain*, 709 S.W.2d at 176.[21]

---

[21] LTT argued below that the jury could infer that SDP breached the Letter of Intent based on SDP's admission that it had communicated with HUD about LTT with respect to LTT's January 18, 2011 FOIA request (PX-186) and after June 11, 2011. 1SCR272. But there is no evidence of the contents of that communication and nothing to connect that communication with any earlier communication. *Marathon Corp.*, 106 S.W.3d at 727-29.

## IV.    The Fee Award Cannot Stand.

Because the jury's findings in answers to Questions 1(b), 6(1), and 6(3) are not supported by legally or factually sufficient evidence, the fee award (CR13240; SCR3) must be reversed.[22]    There is no question that LTT cannot recover attorneys' fees in the absence of a valid claim or in the absence of recoverable damages.  Tex. Civ. Prac. & Rem. Code § 38.001; *Ashford Partners, Ltd. v. ECO Res., Inc.*, 401 S.W.3d 35, 40-41 (Tex. 2012).

## PRAYER

Appellants Surgical Development Partners, LLC and Lakeway Regional Medical Center LLC request that the trial court's judgment be reversed and that the Court render a judgment that Lake Travis Transitional LTCH, LLC take nothing on its claims.  Alternatively, they request a new trial on all issues.  They further ask for all other relief to which they may be justly entitled.

---

[22] The fee stipulation was subject to Appellants' right to challenge any subsequent judgment. CR13241.

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

By: _____*/s/ Jeff Cody*_____
     Jeff Cody
     State Bar No. 04468960
     jeff.cody@nortonrosefulbright.com
     Barton W. Cox
     State Bar No. 2406508
     beau.cox@nortonrosefulbright.com
     James V. Leito IV
     State Bar No. 24054950
     james.leito@nortonrosefulbright.com
2200 Ross Avenue, Suite 3600
Dallas, TX 75201-7932
Telephone: (214) 855-8000
Telecopier: (214) 855-8200

and

NORTON ROSE FULBRIGHT US LLP
     Joy M. Soloway
     State Bar No. 18838700
     joy.soloway@nortonrosefulbright.com
1301 McKinney, Suite 5100
Houston, Texas 77010
Telephone: (713) 651-5151
Telecopier: (713) 651-5246

*Counsel for Appellant/Cross-Appellee,*
*Lakeway Regional Medical Center, LLC*

and

WRIGHT & CLOSE, LLP
>Jessica Z. Barger
>*barger@wrightclose.com*
>State Bar No. 24032706
>Raffi O. Melkonian
>*melkonian@wrightclose.com*
>State Bar No. 24090587

One Riverway, Suite 2200
Houston, TX 77056
Telephone: (713) 572-4321
Telecopier: (713) 572-4320
*Counsel for Appellant/Cross-Appellee*
*Surgical Development Partners, LLC*

## CERTIFICATE OF WORD COMPLIANCE

Pursuant to Texas Rule of Appellate Procedure 9.4(i)(3), the undersigned counsel – in reliance upon the word count of the computer program used to prepare this document – certifies that this brief contains 14,898 words, excluding the words that need not be counted under Texas Rule of Appellate Procedure 9.4(i)(1).

*/s/ Joy M. Soloway*
JOY M. SOLOWAY

**CERTIFICATE OF SERVICE**

I hereby certify that on the 21st day of September 2015, Appellants/Cross-Appellees served a copy of this Brief by electronic service (via FileTime) and email upon the following counsel of record:

Ms. Jane Webre (jwebre@scottdoug.com)
Mr. S. Abraham Kuczaj III (akuczaj@scottdoug.com)
Ms. Paige A. Amstutz (pamstutz@scottdoug.com)
Mr. Steven J. Wingard (swingard@scottdoug.com)
SCOTT, DOUGLASS & MCCONNICO, L.L.P.
One American Center
303 Colorado Street, Suite 2400
Austin, TX 78701
*Counsel for Appellee/Cross-Appellant,*
*Lake Travis Transitional LTCH, LLC*
*n/k/a Lake Travis Specialty Hospital, LLC*

Mr. Robert Bragalone (bbragalone@gordonrees.com)
Mr. B. Ryan Fellman (rfellman@gordonrees.com**)**
GORDON & REES LLP
2100 Ross Avenue, Suite 2800
Dallas, TX 75201
*Counsel for Appellees Brennan, Manna &*
*Diamond, LLC and Frank T. Sossi*

<u>      */s/ Joy M. Soloway*      </u>
JOY M. SOLOWAY

# INDEX TO APPENDIX

| Description | Tab |
|---|---|
| Judgment | 1 |
| Verdict | 2 |
| Letter of Intent | 3 |

53883200



**TAB 1**

CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| LAKE TRAVIS TRANSITIONAL LTCH, | § | IN THE DISTRICT COURT OF |
| LLC n/k/a LAKE TRAVIS SPECIALTY | § | |
| HOSPITAL, LLC, | § | |
| | § | |
| v. | § | TRAVIS COUNTY, TEXAS |
| | § | |
| LAKEWAY REGIONAL MEDICAL | § | |
| CENTER, LLC, SURGICAL | § | |
| DEVELOPMENT PARTNERS, LLC, | § | |
| BRENNAN, MANNA & DIAMOND, LLC, | § | |
| AND FRANK T. SOSSI, | § | 345th JUDICIAL DISTRICT |

## JUDGMENT

On August 11, 2014, this cause came on to be heard. Plaintiff Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC ("Plaintiff" or "LTT"), appeared in person and by attorney of record and announced ready for trial. Defendant Lakeway Regional Medical Center, LLC ("LRMC") and Defendant Surgical Development Partners, LLC ("SDP") (collectively, "Defendants" and each a "Defendant"), appeared in person and by their attorney of record and announced ready for trial. A jury having been previously demanded, a jury was duly empanelled and the case proceeded to trial.

The jury heard the witnesses and the presentation of evidence. At the conclusion of the evidence, the Court submitted the questions of fact in the case to the jury. The charge of the court and the verdict of the jury are incorporated by reference herein for all purposes. On August 28, 2014, the jury returned a verdict to the Court. Because it appears to the Court that the verdict of the jury was for Plaintiff LTT and against

1138876

Defendants SDP and LRMC, judgment should be rendered on the verdict in favor of the Plaintiff LTT and against the Defendants SDP and LRMC.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT, in respect to its breach of contract claim, have and recover actual, past damages from Defendants SDP and LRMC, jointly and severally, in the amount of $7,900,000.00, as well as prejudgment interest on that amount at an annual rate of five percent (5.0%). As of October 13, 2014, prejudgment interest on that amount, calculated as simple interest based on the date this case was filed on April 3, 2012, totals $998,863.01, which amount shall increase by $1,082.19 per day until the date this judgment is signed.

The Court finds that the parties have stipulated that the amount of reasonable attorney fees incurred by Plaintiff LTT in the prosecution of its breach of contract claim against Defendants SDP and LRMC is $2,000,000.00. IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have and recover from Defendants SDP and LRMC, jointly and severally, reasonable attorneys' fees incurred in the prosecution of LTT's breach of contract claim in the sum of $2,000,000.00 pursuant to Chapter 38 of the Texas Civil Practice and Remedies Code.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all costs of court incurred by Plaintiff LTT in this matter are adjudged against and shall be recovered, jointly and severally, from Defendants SDP and LRMC.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that Plaintiff LTT have judgment against Defendants SDP and LRMC, and that the total amount of

2

1138876

judgment for Plaintiff LTT against Defendants SDP and LRMC, jointly and severally, shall be as follows:   actual damages in the sum of $7,900,000.00; plus prejudgment interest on that sum as set forth above; plus attorneys' fees in the stipulated amount of $2,000,000.00; plus costs of court; plus post-judgment interest on the sum total of each of the foregoing, at an annual rate of five percent (5.0%), compounded annually, from the date this judgment is rendered until paid.

IT IS FURTHER ORDERED, ADJUDGED, AND DECREED that all writs and processes for the enforcement and collection of this judgment or the costs of court shall issue as necessary.

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED by the Court that the relief specified above is hereby granted and, as to all parties and issues in this case, all relief not specifically granted herein is expressly denied.  This judgment is final, disposes of all claims and parties, and is appealable.

SIGNED on October ___, 2014.

_____
HONORABLE LORA J. LIVINGSTON
PRESIDING JUDGE

3

1138876

**TAB 2**

ORIGINAL

## CAUSE NO. D-1-GN-12-000983

| | | |
|---|---|---|
| **LAKE TRAVIS TRANSITIONAL LTCH, LLC n/k/a LAKE TRAVIS SPECIALTY HOSPITAL, LLC,** | § § § § | **IN THE DISTRICT COURT OF** |
| **v.** | § § | **TRAVIS COUNTY, T E X A S** |
| **LAKEWAY REGIONAL MEDICAL CENTER, LLC AND SURGICAL DEVELOPMENT PARTNERS, LLC** | § § § § | **345TH JUDICIAL DISTRICT** |

## CHARGE OF THE COURT

LADIES AND GENTLEMEN OF THE JURY:

After the closing arguments, you will go to the jury room to decide the case, answer the questions that are attached, and reach a verdict. You may discuss the case with other jurors only when you are all together in the jury room.

Remember my previous instructions: Do not discuss the case with anyone else, either in person or by any other means. Do not do any independent investigation about the case or conduct any research. Do not look up any words in dictionaries or on the Internet. Do not post information about the case on the Internet. Do not share any special knowledge or experiences with the other jurors. Do not use your cell phone or any other electronic device during your deliberations for any reason.

Any notes you have taken are for your own personal use. You may take your notes back into the jury room and consult them during deliberations, but do not show or read your notes to your fellow jurors during your deliberations. Your notes are not evidence. Each of you should rely on your independent recollection of the evidence and not be influenced by the fact that another juror has or has not taken notes.

You must leave your notes with the bailiff when you are not deliberating. The bailiff will make sure your notes are kept in a safe, secure location and not disclosed to anyone. After you complete your deliberations, the bailiff will collect your notes. When you are released from jury duty, the bailiff will promptly destroy your notes so that nobody can read what you wrote.

Here are the instructions for answering the questions:

1.     Do not let bias, prejudice or sympathy play any part in your decision.

---

Charge of the Court
Page 1 Filed in The District Court
of Travis County, Texas

Filed in The District Court
of Travis County, Texas

AUG 2 7 2014 **RT**
At _____ *1:50 P* ___ M.
Amalia Rodriguez-Mendoza, Clerk

AUG 2 8 2014 **RT**
At _____ *12:20 P* ___ M.
Amalia Rodriguez-Mendoza, Clerk

12997

2.      Base your answers only on what was presented in court and on the law that is in these instructions and questions. Do not consider or discuss any evidence that was not presented in the courtroom.

3.      You are to make up your own minds about the facts. You are the sole judges of the credibility of the witnesses and the weight to give their testimony. But on matters of law, you must follow all of my instructions.

4.      If my instructions use a word in a way that is different from its ordinary meaning, use the meaning I give you, which will be a proper legal definition.

5.      All the questions and answers are important. No one should say that any question or answer is not important.

6.      Answer "Yes" or "No" to all questions unless you are told otherwise. A "Yes" answer must be based on a preponderance of the evidence unless you are told otherwise. Whenever a question requires an answer other than "Yes" or "No," your answer must be based on a preponderance of the evidence unless you are told otherwise.

The term "preponderance of the evidence" means the greater weight of credible evidence presented in this case. If you do not find that a preponderance of the evidence supports a "Yes" answer, then answer "No." A preponderance of the evidence is not measured by the number of witnesses or by the number of documents admitted in evidence. For a fact to be proved by a preponderance of the evidence, you must find that the fact is more likely true than not true.

7.      Do not decide who you think should win before you answer the questions and then just answer the questions to match your decision. Answer each question carefully without considering who will win. Do not discuss or consider the effect your answers will have.

8.      Do not answer questions by drawing straws or by any method of chance.

9.      Some questions might ask you for a dollar amount. Do not agree in advance to decide on a dollar amount by adding up each juror's amount and then figuring the average.

10.      Do not trade your answers. For example, do not say, "I will answer this question your way if you answer another question my way."

11.      Unless otherwise instructed, the answers to the questions must be based on the decision of at least 10 of the 12 jurors. The same 10 jurors must agree on every answer. Do not agree to be bound by a vote of anything less than 10 jurors, even if it would be a majority.

Charge of the Court
Page 2

As I have said before, if you do not follow these instructions, you will be guilty of juror misconduct, and I might have to order a new trial and start this process over again. This would waste your time and the parties' money, and would require the taxpayers of this county to pay for another trial. If a juror breaks any of these rules, tell that person to stop and report it to me immediately.

In answering questions about damages, answer each question separately. Do not increase or reduce the amount in one answer because of your answer to any other question about damages. Do not speculate about what any party's ultimate recovery may or may not be. Any recovery will be determined by the court when it applies the law to your answers at the time of judgment.

Definitions

"LTT" means Lake Travis Transitional LTCH, LLC n/k/a Lake Travis Specialty Hospital, LLC.

"LRMC" means Lakeway Regional Medical Center, LLC.

"SDP" means Surgical Development Partners, LLC.

"Letter of Intent" means the letter agreement between SDP and LTT dated September 15, 2009.

---

## QUESTION NO. 1:

Did SDP and/or LRMC fail to comply with the Letter of Intent?

Answer "Yes" or "No" for each of the following:

a.    LRMC    _Yes_

b.    SDP     _Yes_

If you answered "Yes" to any subpart of Question No. 1 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 2:

Was LRMC's and SDP's failure to comply excused?

Failure to comply by LRMC and/or SDP is excused by LTT's previous failure to comply with a material obligation of the Letter of Intent.

A failure to comply must be material. The circumstances to consider in determining whether a failure to comply is material include:

1. the extent to which the injured party will be deprived of the benefit which it reasonably expected;

2. the extent to which the injured party can be adequately compensated for the part of that benefit of which it will be deprived;

3. the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

4. the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account the circumstances including any reasonable assurances;

5. the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Failure to comply by LRMC and/or SDP is excused if the following circumstances occurred:

1. LTT

   a. by words or conduct made a false representation or concealed material facts, and

   b. with knowledge of the facts or with knowledge or information that would lead a reasonable person to discover the facts, and

   c. with the intention that LRMC and/or SDP would rely on the false representation or concealment in acting or deciding not to act; and

---

**Charge of the Court**
**Page 5**

2.    LRMC and/or SDP

    a.    did not know and had no means of knowing the real facts; and

    b.    relied to its detriment on the false representation or concealment of material facts.

Answer "Yes" or "No" for each of the following:

a.    LRMC    *No*

b.    SDP    *No*

## QUESTION NO. 3:

Did LRMC and/or SDP make a negligent misrepresentation on which LTT justifiably relied?

Negligent misrepresentation occurs when—

1.    a party makes a representation in the course of his business or in a transaction in which he has a pecuniary interest, and

2.    the representation supplies false information for the guidance of others in their business, and

3.    the party making the representation did not exercise reasonable care or competence in obtaining or communicating the information.

Answer "Yes" or "No" for each of the following:

a.    LRMC    *no*

b.    SDP    *no*

---

**Charge of the** Court
**Page 7**

If you answered "Yes" to any subpart of Question No. 3 then answer the corresponding subpart of the following question. Otherwise, do not answer the following question.

## QUESTION NO. 4:

By what date should LTT, in the exercise of reasonable diligence, have discovered the negligent misrepresentation of LRMC and/or SDP?

Answer with a date in the blank below for each of the following:

a.      LRMC

b.      SDP

**Charge of the Court**
**Page 8**

If you answered "Yes" to both subparts of Question No. 3 then answer the following question. Otherwise, do not answer the following question.

Assign percentages of responsibility only to those you found cause or contributed to cause LTT's damages. The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The percentage of responsibility attributable to any one is not necessarily measure by the number of acts or omissions found.

## QUESTION NO. 5:

For each party you found caused or contributed to cause the damages to LTT, find the percentage of responsibility attributable to each:

a.      LRMC    _____ %

b.      SDP     _____ %

         Total    __100__ %

**Charge of the Court**
**Page 9**

If you answered "Yes" to any subpart of Question No. 1, and "No" to the corresponding subpart of Question No. 2, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 6:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that resulted from LRMC and/or SDP's failure to comply with the Letter of Intent?

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any.

Do not add any amount for interest on damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1. The loss in fair market value of LTT's confidential information that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: _$790,000_

2. LTT's lost profits that were a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: _0_

3. The loss in fair market value of LTT that was a natural, probable, and foreseeable consequence of LRMC and/or SDP's failure to comply with the Letter of Intent.

   Answer: _$7,900,000_

Charge of the Court
Page 10

If you answered "Yes" to any subpart of Question No. 3, then answer the following question. Otherwise, do not answer the following question.

## QUESTION NO. 7:

What sum of money, if any, if paid now in cash, would fairly and reasonably compensate LTT for its damages, if any, that were proximately caused by the negligent misrepresentation?

"Proximate cause" means a cause that was a substantial factor in bringing about an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using the degree of care required of him would have foreseen that the event, or some similar event, might reasonably result therefrom. There may be more than one proximate cause of an event.

Consider the following elements of damages, if any, and none other. You shall not award any sum of money on any element if you have otherwise, under some other element, awarded a sum of money for the same loss. That is, do not compensate twice for the same loss, if any. Do not add any amount for interest on past damages, if any.

Do not include in your answer any amount that you find LTT could have avoided by the exercise of reasonable care.

Answer separately in dollars and cents for damages, if any.

1.  The difference, if any, between the value of what LTT received in the transaction and the value given.

    Answer:

2.  The economic loss, if any, LTT otherwise suffered in the past as a consequence of LTT's reliance on the misrepresentation.

    Answer:

**Charge of the Court**
**Page 11**

**Presiding Juror:**

1.       When you go into the jury room to answer these questions, the first thing you will need to do is choose a presiding juror.

2.       The presiding juror has these duties:

a.   Have the complete charge read aloud if it will be helpful to your deliberations.

b.   Preside over your deliberations. This means the presiding juror will manage the discussions and see that you follow these instructions.

c.   Give written questions or comments to the bailiff who will give them to the judge.

d.   Write down the answers you agree on.

e.   Get the signatures for the verdict certificate.

f.   Notify the bailiff that you have reached a verdict.

Do you understand the duties of the presiding juror? If you do not, please tell me now.

**Instruction for Signing the Verdict Certificate:**

1.       You may answer the questions on a vote of 10 jurors. The same 10 jurors must agree on every answer in the charge. This means you may not have one group of 10 jurors agree on one answer and a different group of 10 jurors agree on another.

2.       If 10 jurors agree on every answer, those 10 jurors sign the verdict.

If 11 jurors agree on every answer, those 11 jurors sign the verdict.

If all 12 of you agree on every answer, you are unanimous and only the presiding juror signs the verdict.

3.       All jurors should deliberate on every question. You may end up with all 12 of you agreeing on some answers, while only 10 or 11 of you agree on other answers. But when you sign the verdict, only those 10 who agree on every answer will sign the verdict.

_____
JUDGE PRESIDING      8-27-14

---

Charge of the Court
Page 12

# VERDICT CERTIFICATE

Check one:

_____ Our verdict is unanimous. All 12 of us have agreed to each and every answer. The presiding juror has signed the certificate for all 12 of us.

_____                    _____
Signature of Presiding Juror                    Printed Name of Presiding Juror

_____ Our verdict is not unanimous. Eleven of us have agreed to each and every answer and have signed the certificate below.

_____ Our verdict is not unanimous. Ten of us have agreed to each and every answer and have signed the certificate below.

| SIGNATURE | PRINTED NAME |
|---|---|
| 1. *Victoria Wiesen* | Victoria Wiesen |
| 2. *Eileen McGinnis* | Eileen McGinnis |
| 3. *Deborah Pesek* | Deborah J. Pesek |
| 4. *(signature)* | Sabrina Lenee Hardcastle |
| 5. *Robert D Blackard III* | Robert D Blackard, III |
| 6. *M. Thomson* | Meghan Thomson |
| 7. *(signature)* | Scott Hambleton |
| 8. *Peri S King* | Peri S. King |
| 9. *AB Mullins* | Amanda Mullins |
| 10. *(signature)* | Seyda Okcu |
| 11. *(signature)* | (Juan) Lopiz |
| 12. _____ | _____ |

Charge of the Court
Page 13

**TAB 3**

G. Edward Alexander
Direct Telephone Number: 615-550-2600   ext 12
Cell Phone Number: 615-289-9896
Direct Telefax Number: 615-550-2601
E-Mail:
ealexander@surgicaldevelopmentpartners.com

John T. Prater
Direct Telephone Number: 615-550-2600 - ext 13
Cell Phone Number: 615-714-1898
Direct Telefax Number: 615-550 -2601
E-Mail:
jprater@surgicaldevelopmentpartners.com

VIA E-MAIL – September 15, 2009

Mr. Robert F. Berry
Mr. R. Keith McDonald
13706 Research Blvd., Ste 102
Austin, TX 78750
rfberryok@yahoo.com

RE:  Letter of Intent for the Acquisition of the Lakeway Hospital Lease

Dear Robert and Keith:

Thank you for the opportunity to re-affirm our interest in the acquisition of the lease (the "Lease") for the hospital facility currently under construction in Lakeway, Texas (the "Facility") as the initial campus for Lakeway Regional Medical Center, LLC ("LRMC") and to serve as a key satellite facility for LRMC after the main campus for LRMC is developed (the "Project"). Surgical Development Partners, LLC, ("SDP") is pleased to submit this Letter of Intent, as the agent for LRMC, to each of you (collectively, the "Principals") (each a "Party" and collectively the "Parties") for the Parties to work in good faith with each other to plan, form, develop, fund, acquire, open and operate the Project. The objective of this Binding Letter of Intent is to indicate SDP's interest in the Project and to establish the ground rules for the ongoing exchange of information between the Parties to facilitate the development of the Project and the exchange of information required for such a process to succeed. To clarify this relationship and to best protect the interests of all of the Parties, the Parties hereto agree as follows:

1.  **Discussions and Negotiation of the Project.**   Upon the execution of this Letter of Intent the Parties will enter into discussions and negotiations for a period of forty-five (45) days, which may be extended by the mutual agreement of both parties (the "Negotiation Period"), with regards to evaluating and implementing the proposed Project with one another as well

Exhibit
2
Berry
8/8/13

LTT v LRMC/SDP
No. D-1-GN-12-000983

PX0002

LTT002154
Confidential

as with any third party, as agreed to by the Parties, for the development and implementation of the Project.

2. **The Proposed Outline of the Terms of the Project.** As we have discussed the outline of the terms for the Project are as follows:

   2.1. **Acquisition of the Lease.** LRMC will assume the existing Lease between Lake Travis Transitional LTCH, LLC (or its assignee controlled by the Principals) and HCN Interra Lake Travis LTACH, LLC ("HCN") and become the tenant under the Lease. The Principals and each and every one of their respective affiliates will be relieved of all liability related to the Lease and the Facility upon the assignment of the Lease to LRMC, including, without limitation, the release of any guaranties relating to the Lease by the Principals or any of their respective affiliates, and LRMC shall ensure that all such liabilities in favor of any third parties are released in connection with the assignment of the Lease and shall indemnify and hold the Principals and their respective affiliates harmless from any and all such liabilities from and after the assignment of the Lease.

   2.2. **Reimbursement of Deposits and Costs; Assumption of Obligations.** LRMC will refund at closing of the assignment of the Lease all deposits made by the Principals and their respective affiliates and reimburse to the Principals and their respective affiliates all reasonable and documented costs that have been advanced by them to develop the Facility, including, without limitation, compensation and benefits paid to employees of the Principals and/or their respective affiliates responsible for the planning and construction of the Facility, all expenses incurred in connection with the planning and construction of the Facility, and interest expense associated with indebtedness incurred in connection with the Facility. In addition to the foregoing, LRMC shall assume all liabilities and contractual obligations of the Principals and their respective affiliates incurred with respect to the Facility (whether relating to its development or its ongoing operations following its commencement of operations). In particular and without limiting the foregoing, LRMC shall either offer employment at their current compensation levels to, or shall reimburse Principals and their respective affiliates, as applicable, for severance equal in the aggregate to six months' of such current compensation for, each of the following personnel relating to the Facility: Chief Operating Officer, Vice President of Facilities Management, Vice President of Ancillary and Support Services, Clinical Specialist (Infection Control Nurse), Vice President of Medical Affairs, and Director of Facilities Management.

   2.3. **Lump Sum Payment.** In exchange for the assignment of the Lease to LRMC, LRMC will make a single lump sum cash payment at closing to the Principals, or their designated assignee, equal to $1.5 million.

LTT002155
Confidential

3. **Required Approvals for the Project.** The above indicated terms in Section 2 will be subject to the following conditions: (i) full and formal approval by the Board of Managers of LRMC; (ii) the approval of HCN as landlord under the Lease to the assignment thereof; (iii) a reasonable due diligence process related to the feasibility of the Facility to serve as a campus for a general acute care hospital as configured or reasonably modified; (iv) the ability of LRMC to obtain appropriate funding to allow for this expansion of the operational plans for LRMC; and (v) the mutual development of definitive documents that fully reflect the intention of the Parties expressed in this Letter of Intent. The Parties agree to use their respective best efforts to satisfy each of the foregoing conditions as soon as reasonably practicable, subject to the other terms of this Letter of Intent.

4. **Earnest Money.** In consideration of the Principals' willingness to enter into this Letter of Intent and disclose Proprietary Information relating to the Lease and the Facility to SDP and LRMC, SDP shall cause LRMC to deposit as earnest money the amount of $50,000 with an escrow agent mutually acceptable to the Parties on or before the fifth day following execution of this Letter of Intent. In the event this Letter of Intent is terminated by or on behalf of LRMC for any reason, or in the event definitive agreements for the transactions contemplated herein are not executed by the parties during the Negotiation Period (unless the failure to execute one or more definitive agreements lies with or is attributable to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent), the earnest money, including all interest thereon, shall be forfeited to Principals. If Principals terminate this Letter of Intent, or if definitive agreements for the transactions contemplated herein are not executed by the parties due to the unreasonable delay of Principals or the Principals' unwillingness to agree to terms materially consistent with this Letter of Intent, the earnest money, including all interest thereon, shall be returned to LRMC.

5. **Term.** This Letter of Intent will remain open for acceptance until September 17, 2009. After acceptance this Letter of Intent may be terminated by either Party, for any reason, with written notice to the other Party, subject to the provisions described above relating to the entitlement to the earnest money, and below related to the sharing of information gained in the negotiation and development process.

6. **Standstill and Non-Circumvention Provisions.** Each of the Parties recognizes and acknowledges that in connection with such meetings and the exchange of information to discuss the Project, all Parties will need to act in good faith and not use any knowledge gained in the Project discussion process for their own benefit and exclusive of the rights or interests of the other Party. In order to accomplish that goal, the Parties agree: (i) that Principals will not enter into negotiations with any third party for the assignment of the Lease while this Letter of Intent is in force; (ii) LRMC will not enter into negotiations with any third party for the use of any site, other then the intended LRMC main campus site, as an alternative or satellite facility while this Letter of Intent is in force; and (iii) not to share any information with third parties gained in the negotiation and development process for the

LTT002156
Confidential

Project or to independently use any proprietary information of the other Party in any discussions or negotiations regarding this Project with third parties after the acceptance of this Letter of Intent. The parties agree that these standstill provisions shall not apply to the continued work by Principals on their plans for the operation of the Facility, the continued recruitment of potential investors by Principals to be equity holders in the Principals' project, or other operational matters relating to the Facility during the term of this Letter of Intent, but no such discussions shall preclude the Principals from entering into the definitive agreements contemplated in this Letter of Intent or from consummating the transactions contemplated herein.

7. **Fees and Expenses.** Each party will bear its own expenses associated with the development of the overall strategy and the interaction of the Parties in developing the definitive terms for the agreements contemplated by this Letter of Intent.

8. **Relationship Between the Parties.** None of the provisions of this Letter of Intent are intended to create, nor shall be deemed or construed to create, any relationship between the Parties and any of the Parties' vendors or agents and any of the Parties, other than that of independent entities contracting with each other hereunder solely for the purpose of providing the services described in this Letter of Intent as independent contractors, and otherwise maintaining and carrying out the provisions of this Letter of Intent. None of the Parties nor any of their respective agents or employees shall be construed to be the agent, employer, employee, partner, joint venturer, or the representative of the other parties hereto, for any purpose of any kind or nature whatsoever. Both Parties agree to hold the other harmless from third-party liability resulting from acts of any Party.

9. **Confidentiality.** The Parties desire to assure the mutual confidential status of any information which may be disclosed to or from any Party in the evaluation of this Project and the indicated approach to the Project:

    9.1.    Proprietary Information. Except as provided in Subsection 9.7., below, all information disclosed by any Party or its Representatives at any time to any other Party or its Representatives in connection with the Project in any manner shall be deemed "Proprietary Information." The term "Representative(s)" means, in the case of LRMC or SDP, any director, officer, employee, member, shareholder, or agent of LRMC or SDP engaged in the evaluation of the Project, and in the case of Principals, Robert F. Berry and R. Keith McDonald.

    9.2.    Permissible Use. Each Party that receives Proprietary Information (referred to as the "Receiving Party") shall use the Proprietary Information received from any other Party (referred to as the "Disclosing Party") solely to evaluate the feasibility of the Project or similar transactions between the Parties. No other rights are implied or granted under this Letter of Intent.

LTT002157
Confidential

9.3. Reproduction. Proprietary Information received shall not be reproduced in any form except for internal use of the Receiving Party and its Representatives and only for the express purpose of evaluating the Project.

9.4. Nondisclosure. The Receiving Party shall use all reasonable efforts to protect the Proprietary Information received with the same degree of care used to protect its own Proprietary Information from unauthorized use or disclosure, except that such Proprietary Information may be used or disclosed to the Receiving Party's Representatives as may be reasonably required to evaluate the Project.

9.5. Ownership of Information. All Proprietary Information, unless otherwise specified in writing, shall remain the property of the Disclosing Party and promptly upon request of either Party shall be returned to the Disclosing Party (including all whole or partial copies thereof and any written notes made regarding the Proprietary Information).

9.6. No License or Interest. No rights or obligations other than those expressly recited herein are to be implied. No license is granted to the Receiving Party or otherwise implied, by estoppel or otherwise, with respect to any property or right of Disclosing Party, presently existing or acquired in the future, or for any use of or interest in the Proprietary Information except such use expressly contemplated by this Letter of Intent.

9.7. Exclusions. It is understood that the term "Proprietary Information" does not include Information which:

   (a.) is now or hereafter in the public domain through no fault of the Receiving Party;

   (b.) prior to disclosure hereunder, is properly within the rightful possession of the Receiving Party;

   (c.) is lawfully received from a third party with no restriction on further disclosure; or

   (d.) is obligated to be produced under applicable law or order of a court of competent jurisdiction, unless made the subject of a confidentiality agreement or protective order.

10. **Miscellaneous.**

10.1. Remedies. Based on the subject matter of this Letter of Intent and the mutual obligations and duties indicated herein material and irreparable harm shall be presumed, if any Party to this Letter of Intent breaches any provision of this Letter of Intent. The Parties agree, that in the case of the breach of any of the non-circumvention

**LTT002158**
**Confidential**

or confidentiality provisions of this Letter of Intent, the non-breaching Party will have the right to request that any court of competent jurisdiction shall immediately enjoin the Party in breach in addition to that Party being entitled to all other rights and remedies which the Party may have at law or in equity.

10.2.    Compelled Disclosure. In the event a Party, any of its Representatives, or anyone to whom any Party transmits the Proprietary Information, becomes legally compelled to disclose any of the Proprietary Information, prior to such disclosure such Party will provide the owner of the Proprietary Information with advance written notice and a copy of the documents and information relevant to such legal action, so the owner of the Proprietary Information may seek a protective order or other appropriate remedy to protect its interests in the Proprietary Information, and the compelled Party shall furnish only that portion of the requested Proprietary Information that the compelled Party is advised by a written opinion of counsel is legally required.

10.3.    Entire Agreement. There are no other understandings, agreements, or representations, express or implied, between the Parties, not herein specified until such time as definitive agreements for proposals and letters of understanding can be developed and agreed to by the Parties for any individual Project. This Letter of Intent may not be amended except in a writing executed by all Parties.

10.4.    Assignment. This Letter of Intent may not be assigned without the express written consent of all of the other Parties.

10.5.    Governing Law. This Letter of Intent and all transactions contemplated by this Letter of Intent shall be governed by the laws of the State of Texas.

10.6.    Counterparts. This Letter of Intent may be executed in any number of copies and by the different Parties hereto on separate counterparts. Each counterpart shall be deemed an original, but all counterparts together shall constitute one and the same instrument. The persons executing this Letter of Intent personally represent and warrant that they have been duly authorized to do so by their respective Party and that, upon full execution hereof, this Letter of Intent shall be a binding obligation of said Party.

10.7.    Termination. Termination of this Letter of Intent shall not relieve any of the Parties from the obligations imposed by Section 6 and Section 9 above, with respect to Standstill, Non-Circumvention and/or Proprietary Information exchanged between the Parties, or as it relates to the terms, conditions, plans or discussions regarding the Project.

11. ACCEPTANCE - If Principals are in agreement with the objectives indicated in Section 2 and the conditions indicated in Section 3 of this Letter of Intent and the terms and conditions contained herein, please sign the RETURN COPY of this Letter of Intent and

LTT002159
Confidential

return it to SDP. The terms of this Proposal are valid until 5:00 PM, Central Time, September 17, 2009 and may be accepted as indicated above.

We look forward to our future meetings and the success of the Project which we can accomplish through our mutual efforts.

Sincerely,

**SURGICAL DEVELOPMENT PARTNERS, LLC**

G. Edward Alexander, President and CEO

**Accepted this ___ day of September, 2009 and effective September ___, 2009.**

Robert F. Berry

R. Keith McDonald

LTT002160
**Confidential**